CITY OF DETROIT v. MICHIGAN RAILROAD COMMISSION.

1. TELEGRAPHS AND TELEPHONES—RATES—PUBLIC UTILITIES—AUTHORITY OF CITY UNDER ITS HOME-RULE CHARTER NOT ABSOLUTE.

In proceedings by the city of Detroit to enjoin a telephone company from putting into effect in said city a schedule of rates authorized by the railroad commission, the contention of the city that, under its home-rule charter, it has the sole power to fix telephone rates in said city, cannot be sustained.

2. SAME—RAILROAD COMMISSION—METHOD OF COMPUTING VALUE OF PROPERTY—DECISION OF FEDERAL COURTS BINDING ON STATE COURTS.

The contention of the city that the commission used a wrong method in arriving at the value of the property of the telephone company as a basis for fixing rates cannot be sustained, since the decision of the United States Supreme Court in *City and County of Denver* v. *Denver Union Water Co.*, 246 U. S. 178, approving the reproduction cost

On power of municipality apart from contract to regulate rates to be charged by telephone company, see notes in 33 L. R. A. (N. S.) 759, and 43 L. R. A. (N. S.) 994.

On State statutes regulating rates of telephone companies, see note in 31 L. R. A. 807.

new, less depreciation, method, the one used by the commission in the instant case, is controlling here.

3. SAME—RAILROAD COMMISSION—POWERS TO REGULATE SERVICE—STATUTES.

The power given to the railroad commission with reference to the telephone lines of the State by Act No. 206, Pub. Acts 1913, § 3 (2 Comp. Laws 1915, § 6691), to "regulate by rules or orders any service or facility," *held*, broad enough to justify the schedule of rates applied to four-party lines, providing a measured service beyond a limited number of calls per month, if in the judgment of the commission this schedule would relieve the congestion of the lines generally and improve the service, although the result might be to greatly curtail the use thereof, and force the use of unlimited two-party lines.

4. SAME—DISCRIMINATION.

The rate being applicable to everyone having a four-party line, it cannot be said to be discriminatory.

5. SAME—PUBLIC UTILITIES—RATE-MAKING POWER A LEGISLATIVE AND NOT JUDICIAL FUNCTION.

The making of a rate schedule and the establishing of reasonable rules and regulations for a public utility is a legislative or administrative function and not a judicial one.

6. SAME—POWERS OF COURTS—RAILROAD COMMISSION.

In reviewing the rates established by the commission, the power conferred upon the court is solely to determine whether they are confiscatory or unreasonable, and if the court should so find, it is not authorized to determine what are reasonable rates, but the matter must again be referred to the commission to establish other rates.

7. SAME—RATES—REASONABLENESS—BURDEN OF PROOF.

Under section 18 of said act (2 Comp. Laws 1915, § 6706), the burden of proof is upon one complaining of the order of the commission to show that the same is unlawful or unreasonable.

8. SAME.

*Held*, that plaintiff has not sustained the burden of proof put upon it by said section 18, and the decree of the court below setting aside the order of the railroad commission is therefore reversed.

9. SAME—APPEAL AND ERROR—ORDERS OF RAILROAD COMMISSION—
REVIEW BY COURTS.

> In reviewing the orders of the railroad commission, the
> chancery court does not sit as an appellate commission,
> but matters of fact are left to the determination of said
> commission.

10. SAME—EVIDENCE—COURT WILL NOT WEIGH TESTIMONY.

> The court will not weigh the testimony in order to deter-
> mine whether the finding of the commission is supported
> by the preponderance thereof, but its order will stand if
> there is found substantial testimony supporting its con-
> clusion.

11. SAME—JUDGMENT OF RAILROAD COMMISSION FINAL UNLESS UN-
REASONABLE.

> On matters involving the exercise of good common sense and
> judgment only, the determination of the commission must
> be held to be final unless such determination in its appli-
> cation results in the establishment, by "clear and convinc-
> ing" proof of a rate so low as to be confiscatory or so high
> as to be oppressive.

12. SAME.

> What return a public utility shall be entitled to earn upon
> its invested capital, and what items shall be considered as
> properly going to make up the sum total of that invested
> capital, are questions of fact for the determination of the
> commission, and their conclusions thereon, upon which
> the rate is based, are unassailable unless, as a necessary
> result, it can be affirmatively asserted that the resultant
> rate is unreasonable and unlawful.

13. SAME.

> The fact that the court, if charged with the initial duty of
> determination, might find differently from the commis-
> sion as to the amount of capital invested, or as to the
> rate of return to be permitted upon the invested capital,
> would not warrant it in interfering unless the rate, as
> established, was clearly unreasonable and unlawful.
>
> BIRD, J., dissenting in part.

Cross-appeals from Ingham; Wiest (Howard), J.
Submitted October 10, 1918.  (Docket No. 25.)  Re-
argued January 20, 1920.  Decided April 10, 1920.

Bill by the city of Detroit against the Michigan railroad commission and the Michigan State Telephone Company to set aside an order of defendant commission establishing rates. From the decree rendered, all parties appeal. Reversed, and bill dismissed.

*Beaumont, Smith & Harris* and *David H. Crowley* (*Allan H. Frazer,* of counsel), for plaintiff.

*C. S. Cunningham* and *A. A. Keiser,* for defendant commission.

*Stevenson, Carpenter, Butzel & Backus* (*Thomas G. Long, Leo M. Butzel, Edmund C. Shields,* and *Eugene S. Wilson,* of counsel), for defendant telephone company.

MOORE, C. J. Application was made to the Michigan railroad commission by the Michigan State Telephone Company for leave to put into effect a new schedule of rates and methods for the telephone service in its Detroit exchange area, which includes the city of Detroit, the villages of Highland Park, Hamtramck, St. Clair Heights, Grosse Pointe, Grosse Pointe Park, Grosse Pointe Farms, Grosse Pointe Shores, River Rouge, Oakwood, Ecorse and some township territory. The schedule proposed a change in the method of furnishing service from a rental basis per line, instrument and equipment to a service basis or charge for each message. There were two exceptions from the message rate, that is, one-party and two-party residence telephones of which there are in round numbers 18,386. All other telephones, numbering about 82,694, were to be on the message basis.

It is the claim of the telephone company that the schedule was necessary to produce a reasonable return on the fair value of the property used. It was claimed that when measured service should be put into effect there would be fewer telephone calls than under the flat rate schedule, and that the improvement of the

service was the sole reason for asking permission to furnish service on the message basis, and that better service can be given on the message basis because the subscriber is not then renting telephone equipment but is paying for telephone service.

It is claimed that in the Detroit exchange the congestion is so great that good service on the flat rate basis is a physical impossibility, but with message or metered rates the situation would be different, so that central would be obtained more quickly and connection made with greater dispatch and the operators be relieved of the work of making a large number of noneffective attempts to complete a connection. It is also claimed the present rate schedule does not produce an adequate revenue; that the company has been unable to pay any dividends on the $6,000,000 of common stock outstanding since September, 1914. The company claimed that the total present value shown by the appraisal filed by the company is $12,974,937. The city claimed it was less than $8,000,000. The commission found it is $10,913,191.

The taking of testimony was begun before the commission on April 20, 1916, and continued from time to time until April 17, 1917. Twenty-two hundred pages of testimony were taken. Exhibits embodying calculations, computations, comparisons and other figures, comprising hundreds of pages, were also introduced. The greater portion of the testimony related to the valuation of the property; much of it related to the service as given and the necessity of changing to measure or message rates.

Considerable testimony was directed to the service rendered to the Michigan State Telephone by the American Telephone & Telegraph Company and the payment made by the Michigan State Telephone Company to the American Telephone & Telegraph Company therefor. This is the so-called 4½% contract.

This contract is claimed by the city to be iniquitous because the American Telephone & Telegraph Company is the controlling stockholder of the Michigan State Telephone Company, and that the charge in proportion to the service rendered is disproportionate. Further reference will be made to this contract later.

On the completion of the testimony the commission had the matter under consideration for several months. Under date of January 30, 1918, it made an order establishing a schedule of rates. At the same time that the order establishing the rate schedule was made, an opinion concurred in by two members of the commission was filed. The conclusions reached by the commission did not agree, except in two particulars, with the claims of either party. As respects the valuations, the findings were between the figures claimed by the respective parties. The commission agreed with the claim of the company as to the contract with the American Telephone & Telegraph Company, and that the rate of return to the defendant company should be 8 per cent.

Before the schedule of rates and the order became effective, the city brought this suit to enjoin the putting of the schedule into effect. The taking of testimony before the trial judge having been concluded, and his conclusions reached, the record was referred back to the commission in pursuance of the statute. The commission declined to change its order in any particular, and wrote a further opinion to show the propriety of its order. This report being filed, all of the testimony taken before the commission was read in open court and the matter argued and submitted. From a decree setting aside many parts of the order made by the commission the case is brought here by appeal.

It is the claim of the city that because of its so-called home-rule charter that it has the sole power to fix tele-

phone rates in the city of Detroit. We shall not spend much time with this contention, but content ourselves with saying that the recent case of *Traverse City* v. *Railroad Commission*, 202 Mich. 575, is against the contention of the city and is controlling here.

It is the contention of the city that the commission used a wrong method in arriving at the value of the property as a basis for fixing rates. It claimed, and the city offered testimony to show, that the original cost to the present corporation should control. We quote from the brief:

"Deducting this now from the total investment of the Detroit exchange, from which the toll property has already been excluded, we have as the actual investment of this utility in the Detroit exchange, $7,299,-148. This we submit is a fair value upon which the fair return of this utility should be computed."

As to this phase of the case the trial judge expressed himself in part as follows:

"No matter how much I am impressed with the idea that fair present value cannot be determined under the reproduction cost new—less depreciation method, without considering original cost or actual investment, I cannot in view of the holding in the case of *City and County of Denver* v. *Denver Union Water Co.*, 246 U. S. 178 (38 Sup. Ct. Rep. 278), decided March 4, 1918, condemn that method and set the order of the commission aside for such reason. In that case the court reaffirmed its approval of the reproduction cost new—less depreciation method of appraisal for rate purposes, saying:

" 'There can be no question of the company's right to adequate compensation for the use of its property employed, and necessarily employed, in the public service; nor can it be doubted that the property must be valued as property in use. * * * What we have said establishes the propriety of estimating complainant's property on the basis of present market values as to land and reproduction cost, less depreciation as to structures.'

209—Mich.—26.

"Such approval there of that method, bars disapproval here, even though were this an original matter before me I would not adopt such method."

We think the case cited by the learned judge was directly in point and is controlling.

Another question discussed at great length by counsel called "going value" or cost of establishing the business is regarded as important. The company claimed before the commission that it should be allowed $1,-115,950 as the cost of establishing the business, and the commission allowed $835,215 for this in the rate base. We quote from the opinion of the trial judge:

"The commission allowed 8% of the value of the tangible property for the cost of establishing the business, the theory being 'that purely as a matter of value the live going exchange is worth at least as much more than the dormant one as it would cost to put the dormant exchange into the active condition.' This, of course, estimates the cost of establishing the business, not on actual cost to the investors or consideration of whether such cost has been met in the past out of rates collected, but upon a consideration of a theoretical establishing of the business at the time of the appraisal. * * * In the case at bar the cost of establishing the business was not based upon unrequited sacrifices of the investors, nor a consideration of the invested capital, return thereon, expenditures, operating cost, maintenance, financial history of the company, etc., but upon an assumption that because the business is now in operation it would cost $835,215 under existing expense conditions to bring it to its present efficiency point of service. * * *

"The method adopted leaves out all consideration of the actual history of the company, its rates as formerly fixed by itself, its management whether efficient or otherwise, its operating expenses whether proper or not, its expenditures for equipment or extensions whether now in the tangible appraisal or not, its revenue and what has been done with it, and its return to the investors, and instead of finding what sacrifice, if any, the investors have made to produce the utility ser-

vice before the commission, cost of establishing the business is based upon a fluctuating premise, which has nothing to do with the expense to the company in fact, and is well illustrated in the following question put to Mr. Hagenah and his answer:

"'Q. Of course, if we did this thing over again next year, and your wages had increased 40 per cent., it would give a still higher cost of organizing the business.

"'A. It would tend to increase the amount, yes.' * * *

"The case at bar shows the need of going into the history of this company. In the first instance, the business now being conducted by the company was not established by it but another company, and the sale on foreclosure to this company did not transfer to this company, so as to have it go into the rate base, the cost to the former company of establishing its business. The same can be said of the purchase of competing companies by this company.

"The intangible value of $835,215 placed in the rate base by the commission is set aside."

In the brief filed *in personam* by the railroad commission, its conclusion on this feature of the case is stated in part as follows:

"The learned circuit judge announces that 'the terms "going value" and "going concern value" and "cost of establishing business" have grown to have the same meaning in rate making cases and will be so treated in this opinion.' Going value is perhaps a too broad term to be used accurately in this case. It is often used to define a value resulting from the ability of a business to earn more than a fair return upon the value of the property. No proofs were offered in this matter as to such an element of value and no consideration was given to it by the commission. It is very apparent that such an element of value should not be considered in a rate making case. The cost of establishing the business as considered in this case consisted of actual investment of money by the owners, or loss of adequate return during earlier years when the installed plant facilities were in excess of public requirements. The investigation and the proof submitted was confined to the actual elements of utility

value which cost the company money to produce and which could be measured in dollars and cents.   *   *   *

"Again, there are the costs attending the organiza-tion of competent departmental forces, the teaching and training of operators, the training of expert work-men, etc. Engineers by their observations and experi-ence have come to know that it costs about so much to meet these expenses of establishing business. It is not a cost attaching solely to the early years of the organ-ization but one that follows it through as long as it continues to grow. Each time an extension is made economy requires the prompt establishment of the business in that locality to the full capacity of the in-stalled facilities. Some of the witnesses testified that a term of one and one-half years was required after each installation of plant facilities to complete this es-tablishment of the business. This testimony seems not to have been fully understood by the trial judge.

"These items of cost might have been returned to the owner as dividends prior to the adoption of the ac-counting system had the earnings of the company been sufficient for that purpose. The dividend record of the defendant company which is a part of the evidence in this case seems to show conclusively that the owners or investors were never so reimbursed. It should be kept in mind in considering this item, as well as all others, that the values of property in this proceeding were be-ing determined, not from records, but by a physical examination of the property, made by men of experi-ence, who testified as to their judgment. It has been well said that after all methods of determining value have been considered, that question is still to be deter-mined by the exercise of judgment. In the absence of records of such disbursements in and about the estab-lishment of the business properly segregated, their amount can only be determined in the same manner that other elements of value are determined, viz.: from the testimony of engineers, who by reason of their long experience and investigations have become experts upon such subjects."

There was much testimony offered upon each side as to this feature of the case.

Another question which is argued with great earn-

estness is the rate fixed for four-party line and two-party line service. The trial judge expressed himself in part as follows:

"The four-party line service is unreasonable and discriminatory and was so intended by its proposer, the telephone company; the scheme of the company being to drive the four-party line subscribers to take the two-party line service rather than to put up with the annoyance of reporting their letter at each call; having limited service for the flat rate and a measured service beyond two calls a day. It is true that the commission did not adopt the proposal of the company to give but fifty calls a month for the flat rate but this does not change the purpose the company had in mind.

"The four-party line service was originally installed by the company as a cheap service to attract subscribers and has proved so popular as to overload the lines of the company, and while the old service contracts put a limit on calls per day, the company has, in fact, given unlimited service, but now in an effort to rid itself of a condition it claims is embarrassing to its business, the company wants and expects this new rate and its measured service and regulation to accomplish the end of forcing subscribers to give up that kind of service and take the two-party line service, or in default thereof pay more for four-party line service than for two-party line if the telephone is used to an extent it should be used to justify having one at all.   *   *   *

"The rate and its measured service for the four-party line telephone is unreasonable and viewed from the standpoint of the two-party line rate and service, having in mind the telephone as something more than a parlor ornament, is in accord with a studied scheme on the part of the company to discriminate so unjustly against the use of the four-party line service as to compel subscribers to go to the two-party line service. *   *   *   The rate fixed for four-party line service is unreasonable and unjust and is set aside."

One member of the commission thought the rate fixed was discriminating and should not prevail. The viewpoint of the majority of the commission may be stated as follows:

"An investigation disclosed that nearly 50 per cent. of the patrons in Detroit were being served by what is called four-party line residence telephones. In other words, four subscriber stations were being served by one wire and one switch board connection. This class of residence service was designed to give to persons in Detroit desiring only a limited number of calls per day, a low priced service. The existing four-party line residence rate attempts to limit the calls to two incoming and two outgoing calls per day. It was not found practical to enforce this rate for reasons fully stated in the record. Under these conditions many persons in Detroit became four-party line subscribers and some of them made very extensive use of their telephones. This excessive use created a congestion of business in the exchange, placed a too great burden upon the operating force and confusion very naturally resulted. It is very necessary that that condition be corrected and the commission conceived it to be within its province to correct it by imposing such conditions and such rates as would leave that class of service open only to the persons for whom it was originally designed, namely, persons having but little use for the telephone. If this four-party line residence rate is to be continued in Detroit for the benefit of those subscribers whose need of service is small and whose ability to pay is limited, it must be closed to those whose service requirements are better fitted by a one- or two-party line. To do otherwise makes it possible for a comparative few to take advantage of this low priced service and so abuse it by excessive use as to practically destroy it and to greatly impair service generally throughout the whole exchange area. The commission's schedule is designed to make it economical for each patron to select a class best suited to his service requirement."

Another controverted question grows out of what is known in the record as the 4½% contract. In relation to that phase of the case the trial judge said in part as follows:

"The Michigan State Telephone Company in 1904 entered into a contract under which it agreed to pay the American Telephone & Telegraph Company 4½%

of its total gross earnings as a consideration for the use of telephone instruments furnished by the American Telephone & Telegraph Company, and it is claimed the latter company agreed to finance, engineer and furnish accounting and legal services under the contract.   *   *   *

"At the time the contract was made in 1904 the American Telephone & Telegraph Company was not a stockholder in the defendant company, but has since then become owner of about 97% of its common stock and something over 50% of its preferred.   *   *   * The city contends that the American Telephone & Telegraph Company should be paid a fair rental value for its equipment leased to defendant company or held in reserve for it, and no more, when it comes to the matter of rates to be paid by the public.   *   *   * It claims the telephone instruments were bought by the American Telephone & Telegraph Company from the Western Electric Company, the stock of which is owned by the American Telephone & Telegraph Company; that they cost the American Telephone & Telegraph Company $2.13 per set in 1915, including a 20% profit to the Western Electric Company, and that a proper rental charge should not exceed forty cents per annum for each instrument.  The company claims that the American Telephone & Telegraph Company not only furnishes the instruments, but through its general staff and otherwise renders engineering, accounting, legal and financial services, and keeps abreast of all improvements in telephonic equipment and methods of operation, and that such matters are to the great advantage of the defendant company and in money value exceed all sums paid under the contract.   To this the city replies that the contract does not obligate the American Telephone & Telegraph Company to do any of these things.   *   *   *

"The expense of the defendant company, arising out of the 4½% contract, and now put on the public in full to meet, brings the public squarely to the point where it may question not only the legality of the contract but as well be heard upon the subject of the amount that in equity and good conscience shall be taken under public authority for the benefit of the American Telephone & Telegraph Company under

such contract. Money so exacted from the public for utility service must bear a true relation to benefits conferred by the receiver and the public has an undoubted right to question the expenses the defendant asks be taken care of in the rates the public must pay, and a right to see the contract. *  *  *

"The holding of the commission that this 4½% per annum is a fixed charge and may be collected from rate payers for the American Telephone & Telegraph Company under the contract with the defendant company is set aside and the sum to be collected of the rate payers should be fixed at forty cents per year per set of instruments furnished by the American Telephone & Telegraph Company, including the 3% in reserve."

The majority of the commission refer to this contract in its opinion and we quote from it:

"The American Telephone & Telegraph Company, itself a large corporation, financed by the issuance of its own securities, and occupying the same relative position to telephone companies of several other States, is able with practicability, to and does maintain extensive laboratories and offices where careful experiments are constantly being made, designed to produce improvements and economies in the service. It employs engineers, accountants, auditors and others whose services are highly beneficial to telephone companies, whose employment would be impossible to any of these associated companies individually. The cost to any individual company of maintaining a staff of skilled assistants of like character and ability would be prohibitive; yet under this arrangement the Michigan State Telephone Company now has the benefit of all that these men do or produce in the way of improvements, refinements or economies in telephone facilities, service or methods of operation. True the results of the investigations and experiments of these men, once they are achieved may be given to many associated companies as readily as to one, but that does not lessen the value of them to any one of the associated companies.

"The Michigan State Telephone Company's securities are taken and handled by the American Telephone & Telegraph Company at uniformly low interest rates

and without large discounts. This service is one, the value and importance of which it is impossible to calculate. Much of its materials and supplies are furnished to it through the Western Electric Company at prices, upon terms and of a quality comparing very favorably with those of other supply houses. These items were considered of such definite importance by Mr. Burch that he very properly took them into consideration in the computation of interest during the period of construction. The same benefits accruing during that period continue to the company. A lengthy statement of the services and benefits accruing to the Michigan State Telephone Company, through its association with the American Telephone & Telegraph Company, is a part of the proofs in this case. * * *

"The effect of this arrangement is that the State Company is given the benefit of the services of the most efficient engineers, accountants, traffic men, patent lawyers and others possible to secure. They are furnished with certain standard parts of all telephone sets, which are kept in repair for them. They are aided in their financial matters extensively. These are services which the company needs, which are useful to it, inuring to the benefit of its patrons, which, if they could otherwise be had at all, certainly could not be obtained at any less cost than under their contract with the American Telephone & Telegraph Company. It is apparent that this contract should receive the approval of the commission. * * *

"The facilities used by public utility companies are the property of such companies. Their affairs, subject to the restrictions of the law, are subject to the management and control of their governing body. They are at liberty to make contracts, to purchase facilities and property deemed by them to be necessary and proper for the conduct of their business, to finance their operations according to the dictates of their judgment, and so long as this management is fairly economical and so long as it is honest and does not amount to a fraud upon the public, the commission has no power to interfere. This principle of law is well stated by Justice Brewer in the case of the *Interstate Commerce Commission* v. *Railway Co.*, 209 U. S. 108 (28 Sup. Ct. Rep. 493), where he says:

" 'It must be remembered that railroads are the private property of their owners; that while, from the public character of the work in which they are engaged, the public has the power to prescribe rules for securing faithful and efficient service and equality between shippers and communities, yet in no proper sense is the public a general manager.'

"This same principle is enunciated in *Great Northern R. Co.* v. *Minnesota*, 238 U. S. 340 (35 Sup. Ct. Rep. 753), and in *Chicago, etc., R. Co.* v. *Wisconsin*, 238 U. S. 491 (35 Sup. Ct. Rep. 869, L. R. A. 1916A, 1133) ; the supreme court of New York in the case of *People, ex rel. Power Co.*, v. *Stevens*, 203 N. Y. 7 (96 N. E. 114), said:

" 'The discretion of a public service commission cannot override the discretion of the officers of a corporation in the management of its affairs.'

"It follows, in the opinion of the commission, that unless the contracts between the Michigan State Telephone Company and the American Telephone & Telegraph Company, under which certain facilities are furnished and certain engineering, accounting and other services are rendered to the Michigan State Telephone Company and between the Michigan State Telephone Company and the Western Electric Company, under which the applicant company purchases certain of its supplies and materials, amount to a fraud upon the public by reason of the price paid by the Michigan State Telephone Company being excessive, then the disbursements of the Michigan State Telephone Company, in pursuance of these contracts, must be considered legitimate and proper charges upon its revenues. It was made to appear upon the hearing before the commission by Mr. Burch that the prices and terms at which the Western Electric Company furnished property and facilities to the Michigan State Telephone Company were very favorable, that the facilities furnished by the Western Electric Company were a good standard, the world over, and furnish an excellent basis for fixing unit prices."

The commission made an allowance of 5.6% as depreciation reserve. In relation to that phase of the case the trial judge was of the opinion that there is

merit in the objection made by the city to the allow-ance of 5.6% upon the depreciable fixed capital. He also held this percentage should be materially reduced and a limit placed on the amount of the fund beyond which its accumulation shall not proceed.

The remaining question calling for consideration is the rate of the return that the telephone company is entitled to. The commission thought it should be 8%, while the trial judge thought 7% was sufficient

Before we can solve the important questions in-volved we must consider the powers conferred upon the commission, and second, how far the court will go in reviewing the acts of the commission.

The defendant company contends:

"That the making of a rate schedule is a legislative function and that a court cannot exercise such a func-tion. As the court may not make rates itself, neither may it make the rate base, for the rate follows from the establishment of the rate base, almost by mere mathematical calculation. For a court to undertake to establish the rate base is to assume the whole sub-stance of the rate making power, leaving the legis-lative department but the shadow or empty shell. On a bill filed by the utility to review an order establish-ing rates, on the ground that the order is confiscatory, quite a different situation is presented. There the court is enforcing a constitutional mandate which is of higher sanction than the legislative power—a man-date which the court is empowered and which it is its duty to enforce as against the action of the legislative power. On a bill filed by a party other than the utility there is no constitutional mandate to be enforced by the court. The legislative department is as competent to determine what are just and reasonable rates as is the judicial department. In fact, in point of law, the railroad commission is more competent than a court, as the members are required to have knowledge of traffic and transportation matters as a qualification for their appointment. The commission considers such matters from day to day, while a court has them pre-sented but now and then. For a court to determine

that some rate other than that fixed by the commission is the just and reasonable rate which ought to be charged, is nothing short of a plain substitution of its judgment for the judgment of the commission and a palpable invasion of legislative power. Of course, what is said here does not apply to questions of law."

The city contends in substance that every issue which was open before the commission is likewise open before the court; that the court has power and that it is its duty to consider every question of fact and make its determination thereon; that the plaintiff is required but to satisfy the burden of proof, as a plaintiff is always required to do; in short, that there is no substantial function of the commission which the court may not perform and is called upon to perform.

It must be conceded there is a want of uniformity in the decisions of the courts. In the opinion of the trial court the following is stated:

"If any authority outside of the statute and the decisions of the Supreme Court of Michigan is needed, it can be found. The public service commission law of Missouri in its provisions relative to court review is substantially like ours. In *Chicago, etc., R. Co.* v. *Public Service Commission*, 266 Mo. 333 (181 S. W. 61), it was said:

"'At the very threshold of the case we are met with the contention of counsel for respondents to the effect that the findings of the commission, under the act of its creation are final and conclusive upon this and other courts of the State which might be called upon to review its actions. We are not able to lend our concurrence to that contention. * * * The trial in this court is practically *de novo*. * * * This court under the plain mandate of the statute quoted will consider the entire record, and give to the findings of the commission such weight and consideration as we may deem them entitled to under the law and evidence.'

"Upon a motion for re-hearing it was said:

"'It is urged that we were in error in holding that we would

not be bound by the findings of fact made by the commission in this case. The original opinion holds that these cases must be heard as cases in equity. From that opinion we do not desire to depart. The act says that they shall be so heard. That means that we will consider the evidence *de novo.* In equitable procedure this court is not bound by the findings of fact made by the chancellor *nisi.* We may yield to the judgment of the commission on the facts (if the circumstances of the cause appeal to us) as we may yield to the judgment of the chancellor *nisi* in equity, upon the facts, but not otherwise.'

"In the case of *Lusk* v. *Atkinson,* 268 Mo. 109 (186 S. W. 703), the claim was again made that the court had no power to review the action of the commission, but the court said:

" 'The public service commission has no power to expound authoritatively any principle of law or equity. * * * In providing for a review, by the present writ, of the findings and orders of the public service commission, the legislature carefully bore in mind this distinction, and hence, by Section 111 of the constituting act, it provided for a transfer of the final orders and findings of its administrative agency (public service commission) by writ of review, to the circuit court, for the purpose of testing the reasonableness or lawfulness of its actions. * * * The paragraph indicating the scope and method of review thus lodged in the circuit court concludes in the following terms:

" ' "The circuit courts of the State shall always be deemed open for the trial of suits brought to review the orders and decisions of the commission, as provided in this act, and the same shall be tried and determined as suits in equity."

" 'This latter quotation from the statute is absolutely decisive of the first contention made in support of the action of the public service commission, for it states in expressed terms that the hearing in the circuit court "shall be tried and determined as suits in equity." It is perfectly obvious that the power of court to review thus provided for in the act of the legislature makes the hearing in the circuit court, as well as the determination of the correctness of its action on an appeal to this court, turn solely on the question of the preponderance of the competent evidence adduced on the original hearing before the public service commission, unaffected, as far as the reviewing courts are concerned, by any conclusions of fact or law arrived at by the public service commission when the matter was undergoing investigation before it. * * * It follows that the evidence

contained in the present record is fully reviewable by us, and the
correctness, of the findings of the public service commission and
its affirmance by the circuit court, must be tested by the pre-
ponderance of proof afforded by the evidence contained in the
record.'

"In 1917 the supreme court of Missouri was asked
to reconsider its holdings in the two above cases, and
Mr. Justice Blair, after calling attention to the com-
mission law, making orders of the commissioner *prima
facie* lawful and reasonable, and placing the burden
of proof upon those seeking to set the order aside, and
to show by clear and satisfactory evidence that it is
unreasonable or unlawful, expressed his opinion that
the conclusions reached in the cases in the 266th and
268th Mo. should be reconsidered, but the court re-
affirmed its former holdings. *State, ex rel. Wabash R.
Co.,* v. *Public Service Commission,* 271 Mo. 155 (196
S. W. 369). * * *

"In determining whether a rate fixed by the com-
mission is unreasonable or unlawful on the facts and
circumstances disclosed by the record:

" 'The rights of all interested parties should be considered. In
such consideration the processes and standards of reasoning and
computations that are afforded by law or by common experience,
and the dictates of right and justice should be applied.' *Louis-
ville, etc., R. Co.* v. *Railroad Commission,* 63 Fla. 491 (58 South.
543, L. R. A. [N. S.] 189)."

The trial judge continuing said:

"This court does not engage in administrative work,
but passes on the merits of the case *de novo* and forms
its independent judgment with regard thereto, and
upon this issue the findings of fact of the commission
are not made evidence and are of no binding effect.
The rates must not be unreasonable to the public, and
when this court is given power to decide such a mat-
ter, it follows that such power must be exercised upon
a consideration of the evidence and the legal rights
involved. The legislature could not deprive either the
company or the people of the right of judicial review,
by making the finding of the commission final and
conclusive as to what are reasonable charges. Even
though the statute had been silent upon the subject,

the right of judicial review would exist. The legislature could not prevent the court from reviewing the question of whether the rates are unreasonable."

A case which arose in this State in relation to railroad rates is considered and discussed in the case of *Detroit, etc., R. Co.* v. *Railroad Commission,* 203 Fed. at page 864, and 235 U. S. 402 (35 Sup. Ct. Rep. 126).

An interesting discussion of the principles involved is found in the case of *Interstate Commerce Commission* v. *Railroad Co.,* 215 U. S. 452 (30 Sup. Ct. Rep. 155). In the case of *Interstate Commerce Commission* v. *Railroad Co.,* 222 U. S. 541 (32 Sup. Ct. Rep. 108), the following appears in the opinion:

"In determining these mixed questions of law and fact the court confines itself to the ultimate question as to whether the commission acted within its power. It will not consider the expediency or wisdom of the order, or whether on like testimony it would have made a similar ruling.

" 'The findings of the commission are made by law *prima facie* true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.' *Illinois Cent. R. Co.* v. *Interstate Commerce Commission,* 206 U. S. 441 (27 Sup. Ct. Rep. 700).

"Its conclusion, of course, is subject to review, but when supported by evidence is accepted as final; not that its decision, involving as it does so many and such vast public interests, can be supported by a mere scintilla of proof—but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order."

In a rate-making case, *Louisville, etc., R. Co.* v. *Garrett,* 231 U. S. 298 (34 Sup. Ct. Rep. 48), the court said in part:

"When the legislature, or the body acting under its authority, establishes the rate to be thereafter charged by the carrier, it is the duty of the courts to enforce the rule of law so made unless the constitutional limits of the rate-making power have been transgressed. The

rate-making power necessarily implies a range of legislative discretion; and so long as the legislative action is within its proper sphere, the courts are not entitled to interpose and upon their own investigation of traffic conditions and transportation problems to substitute their judgment with respect to the reasonableness of rates for that of the legislature or of the railroad commission exercising its delegated power. It may be assumed that the statute of Kentucky forbade arbitrary action; it required a hearing, the consideration of the relevant statements, evidence and arguments submitted, and a determination by the commission whether the existing rates were excessive. But, on these conditions being fulfilled, the questions of fact which might arise as to the reasonableness of the existing rates in the consideration preliminary to legislative action would not become, as such, judicial questions to be re-examined by the courts. The appropriate questions for the courts would be whether the commission acted within the authority duly conferred by the legislature, and also, so far as the amount of compensation permitted by the prescribed rates is concerned, whether the commission went beyond the domain of the State's legislative power and violated the constitutional rights of property by imposing confiscatory requirements. *Stone* v. *Farmers' Loan & Trust Co.*, 116 U. S. 307, 331 (6 Sup. Ct. Rep. 334) ; *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 397-399 (14 Sup. Ct. Rep. 1047) ; *Smyth* v. *Ames*, 169 U. S. 466, 526 (18 Sup. Ct. Rep. 418) ; *San Diego Land & Town Co.* v. *National City*, 174 U. S. 739, 754 (19 Sup. Ct. Rep. 804) ; *San Diego Land & Town Co.* v. *Jasper*, 189 U. S. 439, 466 (23 Sup. Ct. Rep. 571) ; *City of Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, 8, 17 (29 Sup. Ct. Rep. 148) ; *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 41 (29 Sup. Ct. Rep. 192) ; *Minnesota Rate Cases*, 230 U. S. 352, 433, 434 (33 Sup. Ct. Rep. 729). Undoubtedly a State may permit appeals to its courts from the rate-making orders of its railroad commission and, upon the review of such orders, it may expressly authorize its judicial tribunals to investigate and decide questions which otherwise would not belong to them, or even to act legislatively (*Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210 [29 Sup. Ct.

Rep. 67]). But the guaranties of the Fourteenth Amendment do not entitle the carrier to the exercise by the courts of such extra-judicial authority."

In the case of the *People, ex rel. New York & Queens Gas Co.,* v. *McCall,* 245 U. S. 345 (38 Sup. Ct. Rep. 122), it is said in part:

"The court of appeals of New York decided that the public service commission was created to perform the important function of supervising and regulating the business of public service corporations; that the State law assumes that the experience of the members of the commission especially fits them for dealing with the problems presented by the duties and activities of such corporations; that the courts in reviewing the action of the commission have no authority to substitute their judgment as to what is reasonable in a given case for that of the commission, but are limited to determining whether the action complained of was capricious or arbitrary and for this reason unlawful; and that it was clearly within the power of the commission to make the order which is here assailed.

"This interpretation of the statutes of New York is conclusive, and the definition. thus announced, of the power of the courts of that State to review the decision of the public service commission, based as it is in part on the decision in *Interstate Commerce Commission* v. *Railroad Co.,* 215 U. S. 452, 470 (30 Sup. Ct. Rep. 155), differs but slightly, if at all, from the definition by this court of its own power to review the decisions of similar administrative bodies, arrived at in many cases in which such decisions have been under examination. Typical cases are: *Baltimore & Ohio R. Co.* v. *Pitcairn Coal Co.,* 215 U. S. 481-494 (30 Sup. Ct. Rep. 164) ; *Kansas City Southern R. Co.* v. *United States,* 231 U. S. 423, 443-4 (34 Sup. Ct. Rep. 125) ; *Louisiana Railroad Commission* v. *Telegraph Co.,* 212 U. S. 414, 420-2 (29 Sup. Ct. Rep. 357) ; *Interstate Commerce Commission* v. *Railroad Co.,* 222 U. S. 541-547 (32 Sup. Ct. Rep. 108), and *Cedar Rapids Gas Light Co.* v. *Cedar Rapids,* 223 U. S. 655, 668 (32 Sup. Ct. Rep. 389). * * *

"Corporations which devote their property to a pub-

lic use may not pick and choose, serving only the portions of the territory covered by their franchises which it is presently profitable for them to serve and restricting the development of the remaining portions by leaving their inhabitants in discomfort without the service which they alone can render. To correct this disposition to serve where it is profitable and to neglect where it is not, is one of the important purposes for which these administrative commissions, with large powers, were called into existence, with an organization and with duties which peculiarly fit them for dealing with problems such as this case presents, and we agree with the court of appeals of New York in concluding that the action of the commission complained of was not arbitrary or capricious, but was based on very substantial evidence, and therefore that, even if the courts differed with the commission as to the expediency or wisdom of the order, they are without authority to substitute for its judgment their views of what may be reasonable or wise. Since no constitutional right of the plaintiff in error is invaded by the order complained of, the judgment under review must be affirmed."

In *Manufacturers R. Co.* v. *United States*, 246 U. S. 457 (38 Sup. Ct. Rep. 383), Justice Pitney, speaking for the court, used the following language:

"Whether a preference or advantage or discrimination is undue or unreasonable or unjust is one of those questions of fact that have been confided by congress to the judgment and discretion of the commission (*Interstate Commerce Commission* v. *Railway Co.*, 168 U. S. 144, 170 [18 Sup. Ct. Rep. 45]) and upon which its decisions, made the basis of administrative orders operating *in futuro*, are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power. This results from the provisions of sections 15 and 16 of the commerce act as amended in 1906 and 1910 (34 U. S. Stat. 589-591, chap. 3591; 36 U. S. Stat. 551-554, chap. 309), expounded in familiar decisions. *Interstate Commerce Commission* v. *Railroad Co.*, 215 U. S. 452, 469-470 (30

Sup. Ct. Rep. 155) ; *Interstate Commerce Commission* v. *Railroad Co.*, 222 U. S. 541, 547 (32 Sup. Ct. Rep. 108) ; *Proctor & Gamble Co.* v. *United States*, 225 U. S. 282, 297-298 (32 Sup. Ct. Rep. 761) ; *Interstate Commerce Commission* v. *Railroad Co.*, 227 U. S. 88, 91 (33 Sup. Ct. Rep. 185)."

We quote from the opinion of Justice Canty in *Steenerson* v. *Railway Co.*, 69 Minn. 353 (72 N. W. 713), as follows:

"While the district court takes the evidence *de novo*, it cannot put itself in the place of the commission, and try the facts in controversy *de novo*. The district court can review the findings of the commission only so far as to determine whether or not the rates fixed are so unreasonable as to be confiscatory, just as an appellate court reviews the verdict of a jury for the purpose of determining whether it is so excessive that it cannot stand. Under the statute, the district court should in this case have determined to what extent the rates fixed by the commission should be modified, so that such rates would not be confiscatory, just as an appellate court often determines how much an excessive verdict shall be cut down, so that it may stand for the balance, and a new trial be denied. The court below held that it had no jurisdiction to determine to what extent the rates here in question should be thus modified, and in this it erred. Of course in determining whether the rates fixed are confiscatory, the court must incidentally consider what are reasonable rates, but it must also resolve every reasonable doubt on that question in favor of the findings of the commission."

We also quote from the opinion of Justice Mitchell in the same case:

"Courts should be very slow to interfere with the deliberate judgment of the legislature or a legislative commission, in the exercise of what is confessedly a legislative or administrative function. To warrant such interference it should clearly appear that the rates fixed are so grossly inadequate as to be confiscatory and hence in violation of the constitution. It is

not enough to justify a court in holding a rate 'unreasonable,' and hence unconstitutional, that if it was its province to fix rates, it would, in its judgment have fixed them somewhat higher.     Any such doctrine would result, in effect, in transferring the power of fixing rates from the legislature to the courts, and making it a judicial, and not a legislative function. When there is room for a reasonable difference of opinion in the exercise of an honest and intelligent judgment, as to the reasonableness of a rate, the courts have no right to set up their judgment against that of the legislature or of a legislative commission. In my opinion, it is only when a rate is manifestly so grossly inadequate that it could not have been fixed in the exercise of an honest and intelligent judgment that the courts have any right to declare it to be confiscatory.     This seems to be substantially the doctrine suggested in *Spring Valley Water Works* v. *Schottler*, 110 U. S. 347-354 (4 Sup. Ct. Rep. 48), which, so far as I can discover, is the first case in which that court suggested any modification or limitation of the doctrine of the so-called *'Granger Cases.'*     And I think it is the doctrine which the courts must finally settle down on, unless they are prepared to assume the function of themselves fixing rates."

We quote from the opinion in *State* v. *Railway Co.*, 130 Minn. 57 (153 N. W. 247, Ann. Cas. 1917B, 1201) :

"The principles on which the court acts in determining whether or not an order of the commission is reasonable, have been the subject of much controversy, but the law on that subject is now pretty well settled. The legislature never intended that the court should put itself in the place of the commission, try the matter anew as an administrative body, substituting its findings for those of the commission.     A statute which so provided would be unconstitutional as a delegation to the judiciary of nonjudicial powers. *Steenerson* v. *Railway Co.*, 69 Minn, 353, 375 (72 N. W. 713) ; *Prentis* v. *Atlantic Coast Line Co.*, 211 U. S. 210, 226 (29 Sup. Ct. Rep. 67) ; *Oregon, etc., Nav. Co.* v. *Fairchild*, 224 U. S. 510, 527 (32 Sup. Ct. Rep. 535) ; *Bacon* v. *Railroad Co.*, 232 U. S. 134 (34 Sup. Ct. Rep. 283) ; *Detroit, etc., R. Co.* v. *Railroad Commission*, 235 U. S.

402 (35 Sup. Ct. Rep. 126). The making of regulations which require a carrier to afford proper transportation facilities to the public, is legislative or administrative and not judicial in its nature. *State* v. *Railway Co.*, 123 Minn. 463 (144 N. W. 155). The courts must not usurp legislative or administrative functions by setting aside a legislative or administrative order on their own conception of its wisdom. *Interstate Commerce Commission* v. *Railroad Co.*, 215 U. S. 452, 470 (30 Sup. Ct. Rep. 155). In *Steenerson* v. *Railway Co.*, 69 Minn., 353, 375 (72 N. W. 713, 716), a rate case, this court, in construing the statute then in force, which was broader than the one now in force, held that it was the intention of the legislature that the court on appeal should 'review the findings of the commission in the same manner as the appellate court reviews the findings of the jury on a trial in the court below. And for this purpose the court may "examine the whole matter in controversy, including matters of fact, as well as questions of law," ' but that the district court can review the findings of the commission only so far as to determine whether or not the rates fixed by the commission are reasonable. This presents a situation somewhat anomalous in that the court may receive evidence in order to determine whether findings of fact are sustainable, but we can conceive of no other fair construction of this statute that will at the same time confine the court within its constitutional powers. The court, on appeal from the order of the commission, must distinguish, then, between the legislative power to establish regulations and the judicial power to determine upon the reasonableness of regulations already established."

In *Minneapolis, etc., R. Co.* v. *Railroad Commission*, 136 Wis. 146 (116 N. W. 905, 17 L. R. A. [N. S.] 821), we find the following language in the opinion:

"The commission has the charge and determination of interests vast in amount, delicate and complicated in their legal and economic relations, affecting the happiness and prosperity of all the people of the State, and involving the consideration and protection of private rights of the most sacred character. Experience

tends to show that public officers, as well as private citizens, are apt to rise in character and dignity to meet great responsibilities, but to shift responsibility where opportunity of shifting is easily afforded and thereby to deteriorate in efficiency and in character. Besides this, the work of the commission requires much expert knowledge of the difficult subject of transportation and rates, the consideration and application of economic as well as legal principles, and an intimacy with local and State traffic conditions. Consequently, unless required to do so by the mandate of law, the circuit courts should interfere as little as they may with the determinations and the work of the railroad commission. But courts, too, are bounden to duty, and cannot throw off at will that which is imposed upon them by law fairly construed and properly understood.  *  *  *

"If this court or the circuit court were by the statute in question authorized to investigate the subject anew, to put itself in the place of the commission and search for this reasonable and just rate, with power to substitute its own judgment of what is reasonable and just for the judgment of the commissioners, the statute might be subject to grave criticism. But the courts are not by this statute so authorized. The authority given to the circuit court is not to search for or disclose or declare this 'reasonable and just' rate or service, but merely to determine whether the order of the commission is 'unreasonable'—quite a different thing. We think the legislature was within its power in conferring upon the courts such authority to inquire whether or not the order of the commission was unreasonable and to vacate the order if so found. In doing so the courts are required to exercise no legislative power, to ascertain and disclose no rates, to declare no rule or no law unreasonable, but merely to exercise judicial power to ascertain and determine whether the commission has so far failed in its search for this lawful, just and reasonable rate as to have found instead and declared that which is unreasonable. The result of the reversal of the order of the commission is not to establish this fact or ascertain this point of reasonableness, but to leave it undisclosed, leaving the former rates to stand or requiring the commis-

sioners to try over again and find it.  In reviewing the order of the railroad commission the inquiry is not whether the rate, regulation, or service fixed by the commission is just and reasonable, but whether the order of the commission is unreasonable or unlawful. The nature of the inquiry is changed at this point, and the court is not investigating for the purpose of establishing a fixed point.  Whether or not the order is within the field of reasonableness or outside of its boundaries, is the question for the court.  It is quite a different question from that which was before the commission in this respect.  The order being found by the court to be such that reasonable men might well differ with respect to its correctness cannot be said to be unreasonable.  From this aspect it is within the domain of reason, not outside of its boundaries.  This is the viewpoint of the reviewing court.  Doubtless the court may, for the purpose of comparison and to aid it in ascertaining how far the order diverges from a reasonable standard, take evidence of and consider such criterion.  But this is only for comparison.  The court cannot legally adjudicate or declare this statutory standard.

"Unless the plaintiff is able to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable, as the case may be, the order must stand.  The words 'clear and satisfactory evidence' are significant, because at the time of the enactment of this statute they were used in the law of this State to describe a degree of proof greater than a preponderance of evidence and such as was necessary in order to establish fraud by that party to an action upon which the burden of proof rested. *Bannon* v. *Insurance Co.,* 115 Wis. 250, 258 (91 N. W. 666); *Shaw* v. *Gilbert,* 111 Wis. 165 (86 N. W. 188); *Dallman* v. *Clasen,* 116 Wis. 113, 117 (92 N. W. 565); *Harrigan* v. *Gilchrist,* 121 Wis. 127, 313 (99 N. W. 909).  *  *  *

"Patience on the part of the public and on the part of the carrier, and time, will be necessary.  The notion that commissions of this kind should be closely restricted by the courts and that justice in our day can be had only in courts is not conducive to the best results.  Justice dwells with us as with the fathers, it is

not exclusively the attribute of any office or class, it responds more readily to confidence than to criticism, and there is no reason why the members of the great railroad commission of this State should not develop and establish a system of rules and precedents as wise and beneficent within their sphere of action as those established by the early common-law judges. We find the statute well framed to bring this about."

In *Citizens Telephone Co.* v. *Railroad Commission,* 157 Wis. 498 (146 N. W. 798), it is said:

"In determining the correctness of the trial court's finding of fact upon the evidence adduced, the nature of the proceeding and statutes governing it must be considered. In an action to set aside the order of the railroad commission 'the burden of proof shall be upon the plaintiff to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable.' * * * Sections 1797-16, Stats. 1913. An examination and study of the evidence in the case convinces us that the circuit court erred in holding that the plaintiff has shown 'by clear and satisfactory evidence that the order of the commission * * * is unlawful.' The inquiry before the circuit court and the principles that must guide it in a review of an order made by the commission were declared in the case of *Minneapolis, etc., R. Co.* v. *Railroad Commission,* 136 Wis. 146, 165 (116 N. W. 905), and is applicable here. It is there said:

"'In reviewing the order of the railroad commission the inquiry is not whether the rate, regulation or service fixed by the commission is just and reasonable, but whether the order of the commission is unreasonable or unlawful.' * * *

"The plaintiff failed to show 'by clear and satisfactory evidence that the order of the commission is unlawful,' and the circuit court erred in awarding judgment vacating the order."

In *Menasha Woodenware Co.* v. *Railroad Commission,* 167 Wis. 19, 26 (166 N. W. at page 438), it is said:

"The commission by a majority of its members, found the existence of all of the above-mentioned es-

sential conditions, and hence made the order complained of. In these actions brought to vacate that order, under section 1797-16, Stats. Wis., the court does not try these questions of fact like a court of first instance; it only determines whether the order of the commission is 'unlawful or unreasonable,' and upon this question the burden of proof is upon the plaintiff to show the fact by clear and satisfactory evidence. As well said by the late Mr. Justice Timlin in the case of *Minneapolis, etc., R. Co.* v. *Railroad Commission,* 136 Wis. 146 (116 N. W. 905, 17 L. R. A. [N. S.] 821) :

" 'Whether or not the order is within the field of reasonableness, or outside its boundaries, is the question for the court. It is quite a different question from that which was before the commission in this respect. The order being found by the court to be such that reasonable men might well differ with respect to its correctness cannot be said to be unreasonable.'

"See, also, *Citizens' Telephone Co.* v. *Railroad Commission,* 157 Wis. 498 (146 N. W. 798)."

We do not need to go outside of the statutes and decisions of this State to find the law applicable to and controlling of the questions involved in the case before us. By Act No. 300 of Public Acts of 1909 (2 Comp. Laws 1915, § 8109 *et seq.*), the legislature created the Michigan railroad commission and gave it certain powers over the various railroad companies of the State. Some of the provisions of this act have been the subject of judicial determination and a reference to the opinions in those cases will be helpful here. By Act No. 206, Public Acts of 1913 (2 Comp. Laws 1915, § 6689 *et seq.*), the legislature gave to the railroad commission certain powers with reference to the telephone lines of the State. In section 3 of the act is found the following language:

"All charges made for any service rendered, furnished or performed, or to be rendered, furnished or performed within the State by any telephone company shall be reasonable and just, and every unjust and unreasonable charge for such service is prohibited and

declared to be unlawful; and the commission shall have power to make, alter, amend or abolish any rate or charge for any service, and may regulate by rules or orders any service or facility." * * *

It may be said, parenthetically, the words "and may regulate by rules or orders any service or facility" are broad enough to justify the schedule of rates as applied to the four-party lines, if in the judgment of the commission this schedule would relieve the congestion of the telephone lines generally, and do away with the physical impossibility to give good service—would improve the service. As every user of a telephone on the four-party line is given the same rate, and everyone having a telephone on the two-party line pays the same rate as everyone else having a telephone on that line, it cannot be said the rate is discriminatory.

Section 4 of the act makes unjust discrimination and rebating unlawful. Section 12 provides for the hearing by the commission of any complaint against the telephone company. Section 14 provides for the commencement of a proceeding in chancery to vacate or set aside any order made by the commission, "the hearing thereof and the same shall proceed, be tried and determined as other chancery suits." Section 17 provides for an appeal of the case to the Supreme Court. Section 18 reads:

"In all actions under this section the burden of proof shall be upon the complainant to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable, as the case may be."

As long ago as 1899 in *Michigan Telephone Co.* v. *City of St. Joseph*, 121 Mich. 502 (47 L. R. A. 87), Chief Justice GRANT, speaking for the court, said:

"It is conceded by the learned counsel for both parties that that part of the decree by which the court assumed the right to establish reasonable rules and reg-

ulations is void.   This is a legislative or administrative function, and not a judicial one.   The court has power to put the proper authorities in the defendant city in motion to adopt reasonable rules and regulations, and to pass upon the validity of such action when taken.   This is the extent of its authority. *Houseman* v. *Kent Circuit Judge*, 58 Mich. 364; *City of Manistee* v. *Harley*, 79 Mich. 238.   Other courts recognize the same rule. *Reagan* v. *Trust Co.*, 154 U. S. 362 (14 Sup. Ct. Rep. 1047) ; *Appeal of Norwalk St. Ry. Co.*, 69 Conn. 576 (37 Atl. 1080, 38 Atl. 708, 39 L. R. A. 794) ; *Nebraska Telephone Co.* v. *State*, 55 Neb. 627 (76 N. W. 171, 45 L. R. A. 113)."

In *Michigan Cent. R. Co.* v. *Wayne Circuit Judge*, 156 Mich. 459, it is said:

"We do not construe the provisions of this act to lodge in the courts the power to establish rates.   The power conferred upon the courts is solely to determine whether the rates are confiscatory or unreasonable.   If the courts should so find, they are not authorized to determine what are reasonable, but the matter must again be referred to the commission to establish other rates."

In *Michigan Cent. R. Co.* v. *Railroad Commission*, 160 Mich. at p. 368, it is said:

"This brings us to the question as to whether or not there was any evidence before the commission tending to show that the rates theretofore in effect were unreasonable.   It should be borne in mind that under the statute all the rates fixed by the commission are *prima facie* lawful and reasonable, and that the burden of proof was upon the railroads to show by satisfactory evidence that the order was unreasonable.   It was well said by the court in *Missouri, etc., R. Co.* v. *Interstate Commerce Commission*, 164 Fed. 650:

" 'In approaching the consideration of a case like this, the court should start with the presumption that the order is valid, and was made after careful consideration and correct determination of every question of fact underlying it, and it should be accorded that respect and influence which ought to attend, and does attend, the action of a legislative or administrative board, whose

members are, in point of ability, learning and experience specially qualified to determine such matters. In short, the burden of showing that the facts are such as to render the order invalid rests upon the carrier assailing it, and unless the case made on behalf of the carrier is a clear one, the order ought to stand.'

"There is no doubt that had the railroad companies offered in evidence before the commission many things that were peculiarly within their knowledge, the commission would have been greatly assisted. But as they saw fit to offer no testimony there, nor on the hearing of the case, after a reading of the testimony offered before the commission, we are clearly of opinion that there was evidence before that body upon which it was justified in making the order."

In *Detroit, etc., R. Co.* v. *Railroad Commission,* 171 Mich. 335, Justice OSTRANDER, speaking for the court, said:

"We apprehend that the words 'reasonable and just' in the statute do not mean nonconfiscatory, as the word 'confiscatory' is usually defined. The legislature has not fixed the freight rates to be charged by complainant beyond this: It has prohibited and made unlawful every unjust and unreasonable charge. It permits reasonable and just rates to be charged for services performed. It has confided to the Michigan railroad commission the power, with the duty to ascertain, in proper cases, whether a rate is reasonable and just or unreasonable and unjust, and to thereupon make an order in conformity with the facts. The facts being found, it is the legislature which speaks, approvingly or disapprovingly as the case may be. The important business of the commission with respect to rates is ascertaining facts. Its findings are not conclusive, but have the effect of establishing *prima facie* that the rates considered are reasonable and just and therefore lawful, or are unreasonable and unjust and unlawful. Its orders stand until modified or set aside by it or by the courts. The duty of the courts in the premises is not essentially different from that of the commission. No different conclusion was stated in *Michigan Cent. R. Co.* v. *Wayne Circuit Judge,* 156 Mich. 459 (16 Ann. Cas. 832). It is only after determining that the rate

fixed by the commission is unreasonable that the court may set it aside.   Presumptively, the findings and orders of the commission are right.   If attacked, the complainant has the burden of showing 'by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable, as the case may be.' "

In *Re Briggs,* 178 Mich. 28, Justice STONE, speaking for the court, said:

"The jurisdiction of the circuit court, in chancery, in the instant case was strictly statutory, and it was not exercising its general equity jurisdiction, as in ordinary chancery cases.   By the provisions of section 12 of Act No. 138, Public Acts of 1911 (3 How. Stat. [2d Ed.] § 7233), William L. Jones, being dissatisfied with the order of the railroad commission, had the right to commence an action in the circuit court, in chancery, against the commission as defendant, to vacate and set aside such order as unreasonable, and on leave of the court the Cass County Home Telephone Company might intervene as a defendant as it did. Clearly there is no general equity jurisdiction in the circuit court, in chancery, to declare an order of a commission or body unreasonable.   The entire proceeding in the circuit court, in chancery, was statutory, and the court was not acting in the exercise of its general equitable jurisdiction.

"By the provisions of section 16 of the act the order of the railroad commission was *prima facie* lawful and reasonable, and should have been continued in force pending the chancery suit, and the burden of proof was upon the complainant in that suit to show by clear and satisfactory evidence, that the order of the commission complained of was unreasonable.   *Michigan Cent. R. Co.* v. *Railroad Commission,* 160 Mich. 355."

It is said that in the 1913 act there is no provision that the order of the commission shall be, *prima facie,* lawful and reasonable.   A reference to the provisions of section 18 of the 1913 act which has already been quoted, will show that this contention is a distinction without a difference.

In *Michigan State Telephone Co.* v. *Railroad Commission,* 193 Mich. at p. 529, Justice PERSON, speaking for the court, said:

"The interest of the public in a proper regulation of public service corporations is continually becoming more vital and important, and any action of the State through its organized boards and commissions in the exercise of that power should not be set aside by the courts, except in instances of the clearest necessity. This is the view taken by the legislature. Section 18 (2 Comp. Laws 1915, § 6706) of the act explicitly declares that:

"'In all actions under this section the burden of proof shall be upon the complainant to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable, as the case may be.'

"What rates would be required to prevent the surrender of complainant's telephones by such residents and business houses of the city as now employ them is not shown by the record. Nor is it shown that an adjustment of rates, tolls and charges by the commission under its powers as we have construed them could not be so made as to obviate the injurious results which complainant apprehends from an enforcement of the order. And from the very nature of the order it is within the power of the commission to rescind it if it is found to operate unduly to complainant's injury."

In *Traverse City* v. *Railroad Commission,* 202 Mich. 580, Justice STEERE, speaking for the court, said:

"The status of telephone companies, recognized at common law as analogous to common carriers, and sometimes held to be such, is settled in this State by the statute so classifying them. That the State may regulate charges of common carriers, and the power to fix the rates which they may charge the public for their services is a legislative and not a judicial function, is now elemental; the judicial function, or power of the courts, being limited to determining whether any particular rate fixed by the legislature or its duly authorized agency is reasonable or otherwise."

It remains to apply the principles of law shown by the great weight of authority to the instant case. The questions involved are complex and intricate. A solution of them called for expert knowledge. Eight or more witnesses were sworn on the part of the city. Twenty or more were produced on the part of the defendant. Nearly a hundred exhibits were offered in evidence. Mr. Edward P. Burch, consulting engineer of Detroit and Minneapolis, supervised and directed the preparation of an inventory and appraisal on behalf of the city of Detroit, and in so doing had the assistance of Mr. Wray and other men of experience and ability. The making of the inventory and appraisal on behalf of the company was supervised by Mr. William J. Hagenah, formerly of the Wisconsin railroad commission. In the making of the appraisal Mr. Hagenah had the assistance of a number of men having technical knowledge.

The printed record contains more than 2,000 pages. The commission, the trial judge and this court were aided by oral arguments and carefully prepared printed briefs. The briefs in this court contain more than 700 pages with many authorities cited. The testimony covered every possible phase of the case; as might be expected the experts did not agree and it is impossible to reconcile the conflicting testimony. The commission gave the parties in interest a long and patient hearing. The commission was not agreed in all respects, but a majority of them fixed a schedule of rates that they deemed just and reasonable. If the schedule of rates had been put to actual test and had been found to be unjust and unreasonable the commission had the right, and it would be its duty, to so change them that they would not be unjust and unreasonable.

There are other questions raised by the record and discussed by counsel which have had our careful con-

sideration, but which we cannot discuss at length without swelling this already lengthy opinion to undue proportions.

A careful consideration of this voluminous record, of the briefs and oral arguments of counsel, convinces us that the complaining party has not met the burden put upon it by section 18, Act No. 206, Pub. Acts 1913, "to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable."

The decree of the court below is reversed and the bill of complaint is dismissed with costs in favor of the defendant.

STEERE, STONE, CLARK, and SHARPE, JJ., concurred with MOORE, C. J. FELLOWS, J., did not sit.

BROOKE, J. (*concurring*). While I agree with the conclusion reached by my Brother MOORE, in the light of the fact that judicial reviews of orders made by the public utilities commission are likely to become more numerous in the future I believe it proper to define, at least with some approximation, the powers to be exercised by and the duties imposed upon the judge of a court, in chancery, when engaged in such review.

Primarily, I think it is clear that the court in chancery does not sit as an appellate commission. Matters of fact are and should be left to the determination of the commission, who must, from the very fact of their official position, be deemed to be expert in the matters over which they are given jurisdiction. As a matter of fact, long familiarity with the problems arising out of the rate-making power and constant and exhaustive examination of the vexatious questions involved in the exercise of that power tends to make practical experts of the men appointed upon the commission.

The reviewing court is interested in the determination of one question and one only, and that is,

whether the rates fixed or the orders made by the commission are *unreasonable* and therefore unlawful. The testimony taken before the commission may be and should be considered by the court for the purpose only of the determination of that single question. In considering said testimony, the court will not weigh the same in order to determine whether the finding of the commission is supported by the preponderance thereof but the order will stand if there is found *substantial* testimony supporting the conclusion of the commission.

On matters involving the exercise of good common sense and judgment only, the determination of the commission must be held to be final unless such determination in its application results in the establishment by "clear and convincing" proof of a rate so low as to be confiscatory or so high as to be oppressive. What return a public utility shall be entitled to earn upon its invested capital, and what items shall be considered as properly going to make up the sum total of that invested capital, are questions of fact for the determination of the commission, and their conclusions thereon, upon which the rate is based, are unassailable unless, as a necessary result, it can be affirmatively asserted that the resultant rate is unreasonable and unlawful.

Between the point where a rate may be said to be so low as to be confiscatory and the point where it must be said to be so high as to be oppressive upon the public, there is a "twilight zone" within which the judgment of the commission may operate without judicial interference. Assume that the commission, in determining the amount of the capital invested, allows as an element of the sum an amount which the court, if charged with the initial duty of determination, might find to be excessive or inadequate; or, assume that the

209—Mich.—28.

commission, in the exercise of its best judgment, permitted a rate of return upon the invested capital higher or lower than the court, under like circumstances, might believe to be proper—nevertheless, the court would not be warranted in interfering unless the rate, as established, was clearly unreasonable and unlawful.

MOORE, C. J., and STEERE, STONE, CLARK, and SHARPE, JJ., concurred with BROOKE, J.

BIRD, J. (*dissenting*). The Michigan State Telephone Company submitted a schedule of rates to the Michigan railroad commission with a prayer that they be made applicable to the Detroit exchange. In response to this a hearing was had and the commission determined the rates which should be applicable in that zone. The city of Detroit feeling aggrieved by such determination and claiming the rates so fixed were unreasonable and unlawful, it filed this bill in the Ingham circuit court to have the same set aside. As a result of the court hearing the order made by the commission was materially modified and much of it set aside. One of the first questions discussed is the power and duties of the chancery court in such a proceeding.

These proceedings are authorized by Act No. 206 of the Public Acts of 1913 (2 Comp. Laws 1915, § 6689 *et seq.*). Section 14 is the important section in this inquiry:

"SEC. 14. Any telephone company or other party in interest, being dissatisfied with any final order of the commission made in any proceeding under this act, may within thirty days from the issuance of such order and notice thereof, commence an action in the circuit court, in chancery, against the commission as defendant to vacate and set aside any such order on the ground that the certificate granted or withheld is not in accordance with the rights of the parties, that the rate or rates, charges, joint rate or rates fixed are un-

lawful or unreasonable, or that any such regulation, practice or service fixed in such order is unreasonable; in which suit the commission shall be served with a subpœna and a copy of the complaint. The commission shall file its answer and on leave of court any interested party may file an answer to said complaint. Upon the filing of the answer of the commission said cause shall be at issue and stand ready for hearing upon ten days' notice by either party. All suits brought under this section shall have precedence over any civil cause of a different nature pending in such court, and the circuit court shall always be deemed open for the hearing thereof, and the same shall proceed, be tried and determined as other chancery suits. Any party to such suit may introduce original evidence in addition to the transcript of evidence offered to said commission, and the circuit courts, in chancery, are hereby given jurisdiction of such suits and empowered to affirm, vacate or set aside the order of the commission in whole or in part, and to make such other order or decree as the courts shall decide to be in accordance with the facts and the law."

To the Michigan railroad commission the legislature has by this act delegated the authority to prescribe lawful and reasonable telephone rates. To chancery courts, when appealed to, it has imposed the duty to see that this is done. The commission, upon petition in a given case, takes the testimony offered and arrives at what it conceives to be a lawful and reasonable rate. This rate becomes the authorized rate and is made *prima facie* a lawful and reasonable rate. If no one is aggrieved, this is the end of the matter. If, however, any interested party is aggrieved he may have recourse to the chancery court. The chancery court hears the same evidence which was heard by the commission, and more, if offered, and determines whether the rate so fixed is a lawful and reasonable one. If the court is impressed that the rate is a lawful and reasonable one the relief prayed for is denied. If the chancellor is convinced from the testimony

either that the rate fixed by the commission is unlawful or unreasonable the rate is set aside. The matter then goes back to the commission for further consideration. This is as far as the court can go because it cannot make the rate, that being a legislative question. In other words, the commission hears the testimony for the purpose of making a reasonable and lawful rate. The court hears the testimony, not for the purpose of making the rate, but for the purpose of determining whether the rate so made is a lawful and reasonable one.

But it is argued that if the court finds there was any evidence before the commission which justifies its order, or that the order is within the field of reasonableness, the duty of the court is at an end and it cannot be disturbed. This necessarily assumes that the court is bound by the findings of fact arrived at by the commission. If this be the true interpretation the judgment of the chancellor as to whether the rate is a reasonable one would be of very little force in many cases. The legislature could not have meant this because if it had it would have provided for a finding of facts by the commission which would be final and binding, as it did in the workmen's compensation act. Under the workmen's compensation act the finding of the commission on questions of fact in the absence of fraud are binding on the courts, and it is safe to assume that had the legislature intended the same procedure in this act it would have taken the trouble to say so. The weakness of this argument is further shown by the provisions of the statute that: "The same shall proceed and be tried and determined as other chancery suits."

If, as is argued, the chancellor is bound by the findings of the commission, it is extremely difficult to see how it can be tried as other chancery suits are tried. It is only necessary for one to imagine the chancellor

attempting to try the issues in a workmen's compensation case as other suits are tried, when he is bound by the findings of the commission, to conclude that the legislature never intended any such incongruous proceeding. It is conceivable that an order made by the commission might be found by the court to be barely justified by the proofs and yet, upon the whole record, the rate might be an unreasonable one. If the legislature did not mean that the chancellor should conduct a hearing and reach an independent judgment as to the reasonableness of the rate it is pretty difficult to discover why it issued a mandate to him to try the issues as other chancery suits are tried. The legislature intended something by this language and we should try and give it some effect. The evident object of this legislation was to secure to both, company and patron, a lawful and reasonable rate. In order to bring this about an arbiter in the form of a commission was created to stand between the company and its patrons. This arbiter was enjoined to so fashion the rates that they would be lawful and reasonable, and the legislature, to further protect the rights of both, placed a check over this arbiter by providing that the chancery court might determine in any given case whether the arbiter had done the thing that it was enjoined by the statute to do, namely: To fix a lawful and reasonable rate. This is not rate making. For a chancery court to hear testimony bearing on the reasonableness of the proposed rate for the purpose of determining whether it is a reasonable rate is consistent, not only with the inherent power of the court, but it is in accord with and in obedience to the mandate of the legislature as evidenced by this act.

Many cases are cited in the briefs interpreting the Federal statutes and the statutes of other States creating public utility commissions. These discussions are of general interest in considering the question, but

are not very helpful in construing the specific language of our own act, because of the variance in the statutory provisions. It might be mentioned, however, in passing, that the Missouri public utility statute is very similar to our own, and the interpretation put upon the power of the court in that State is not unlike the interpretation herein set forth. *Chicago, etc., R. Co.* v. *Public Service Commission,* 266 Mo. 333 (181 S. W. 61) ; *Lusk* v. *Atkinson,* 268 Mo. 109 (186 S. W. 703) ; *State, ex rel. Wabash R. Co.* v. *Public Service Commission,* 271 Mo. 155 (196 S. W. 369).

Our conclusion is, as we have heretofore held, that "the duty of the court in the premises is not essentially different from that of the commission." *Detroit, etc., R. Co.* v. *Railroad Commission,* 171 Mich. 335. In the matter of procedure both travel the same road but when the hearing is at an end the commission makes the rate and the court determines whether it is reasonable. This view is also in accord with the holding of the chancellor who heard the case. My views on the remaining questions, with one exception, are so nearly in accord with those expressed by the chancellor that I think his opinion on them should be adopted as the opinion of this court. The exception referred to will be considered at the close of the opinion. The opinion of the chancellor follows:

"The Rate Base. The city asks the court to set the order of the commission aside because the rate base has been established on a finding of the present value of the property used and useful in giving the service under the reproduction new, less depreciation, plus going value method, claiming that such method is unfair to the public and insists that the rate base must be determined either from the actual investment deduced from the books of the company, or upon the investment it has made in this property, the sacrifice it has undergone in the management of the property and the reasonable and proper investment which it has made in order to discharge its functions in serving the pub-

lic with telephonic service, to the date of fixing rates, or at least these matters must be given consideration in estimating the value under the reproduction cost new. The court in considering the value as fixed by the commission will first take up the appraisal of the tangible property and later the intangible.

"Plaintiff claims that the value placed on the tangible property of the company is too high, and not enough allowance made for accrued depreciation; that it is based on the theory of reproduction cost new—less depreciation—without adequate consideration of actual or original cost and, therefore, real investment, and the commission fell into the error of splitting the difference in some instances between the estimates of the two experts, who based their calculations upon different methods. No matter how much I am impressed with the idea that fair present value cannot be determined under the reproduction cost new—less depreciation method, without considering original cost or actual investment, I cannot in view of the holding in the case of *City and County of Denver* v. *Denver Union Water Co.*, 246 U. S. 178 (38 Sup. Ct. Rep. 278), decided March 4, 1918, condemn that method and set the order of the commission aside for such reason. In that case the court reaffirmed its approval of the reproduction cost new—less depreciation method of appraisal for rate purposes, saying:

" 'There can be no question of the company's right to adequate compensation for the use of its property employed, and necessarily employed, in the public service; nor can it be doubted that the property must be valued as property in use. * * * What we have said establishes the propriety of estimating complainant's property on the basis of present market values as to land and reproduction cost, less depreciation, as to structures.'

"Such approval there of that method, bars disapproval here, even though, were this an original matter before me I would not adopt such method. Upon a consideration of the evidence relative to the value of the physical property, while I am of the opinion that the finding of the commission is most liberal to the company, I am not prepared to change it by merely substituting my judgment for that of the commissioner. At the best and under approved systems of

appraisal, the matter of fair present value of tangible property can hardly be determined with certainty, but must rest to some degree upon estimate. The value of the tangible property is largely a matter of opinion, and the court would have to go beyond mere difference of opinion from that of the commission to set their finding aside and overcome the statutory rule of *prima facie* correctness. The commission had a right to depart from the estimates of the experts.

"In *Public Service Gas Co.* v. *Public Utility Com'rs*, 87 N. J. Law, 585, it was held that the commission was

" 'Entitled upon the evidence before them, to conclude that the valuation stated by one set of experts was too high and that stated by the other set was too low, and to ascertain upon all the testimony what, in their best judgment, was the true valuation.'

"I agree with this opinion so far as the tangible property is concerned.

"A low estimate of accrued depreciation at the time of the appraisal, shows either a high state of preservation and efficiency of the property, or portends a change in the near future, both of which operate to the advantage of the company. The nearer the company can get its property appraised at reproduction value, the higher the rate base; the future depreciation will not lower the rate base but call upon the public to pay rates to maintain the depreciation fund. The age and life of equipment should certainly be considered upon the question of depreciation, and while the company urged the commission not to use the age and life method, I am unable to say that it was not given consideration by the commission. If it turns out that the rate base is too high, considering the rates allowed and the return to the investors, and practical experience so demonstrates, then the matter is easily remedied and undoubtedly will receive prompt attention at the hands of the commission by lowering the rates. Under the reproduction cost new—less depreciation method, the present fair value of the property used and useful in serving the public is sought, and this gives no consideration to the actual cost of the property acquired when the competing companies were purchased. Under any other system of appraisal such cost would receive consideration, but as I said before, I am not

permitted to set the finding aside on the ground that I do not approve of the method used. I do not understand that the Supreme Court of the United States has decided against other methods, but only that it has approved the reproduction cost new—less depreciation method in the case before it.

" 'Going Value,' or Cost of Establishing the Business. The company claimed before the commission that it should be allowed $1,115,950 as the cost of establishing the business, and the commission allowed $835,215 for this in the rate base. This was based evidently on the estimate of Mr. Hagenah, in his appraisal for the company and comprehends his understanding of the value

" 'which a well established utility has in the fact that it is a going concern with an established business and established income, and efficient organization, its operating records complete; all as distinguished from the physical property alone which might be merely a skeleton ready for service, but not having the human means of operation and producing that service.'

"Mr. Hagenah, in making his estimate, used the method known as the cost of training and developing the physical organization with reference to the plant, traffic, commercial and accounting departments, making a study of each for the eighteen months immediately preceding his estimate, to find the number and class of employees, character of service required from them, wages paid, expense of training them, etc.

"The commission allowed 8 per cent. of the value of the tangible property for the cost of establishing the business, the theory being 'that purely as a matter of value, the live going exchange is worth at least as much more than the dormant one as it would cost to put the dormant exchange into the active condition.' This, of course, estimates the cost of establishing the business, not on actual cost to the investors or consideration of whether such cost has been met in the past out of rates collected, but upon a consideration of a theoretical establishing of the business at the time of the appraisal. In the opinion upon this subject the commission call attention to the case of the Michigan Northern Power Company, in which an order was made by the Michigan commission in 1913, allowing seven per cent. upon

the estimated cost of the physical property, to cover the cost of establishing the business. This allowance was made, as I understand the case, upon the ground that it would cost that percentage to establish the business, the concern being new and without business. At bar we have an established business, either paid for out of rate collected, or built up out of sacrifice of the right of return by the owners; either horn of which is a question of fact and not of theory.

"The commission also calls attention to the fact that in the *Passiac Gas Case* [87 N. J. Law, 705], the New Jersey utility commissioners held 'that going concern value will be largely represented by the cost of developing the business,' and made an allowance for that value, amounting to 30 per cent. of the structural value, less working capital. But in that case the 30 per cent. included costs of obtaining franchises, charters, preliminary investigations, preliminary engineering, deficits in operation, and lack of profits in the earlier years and unearned depreciation. See *City of Long Branch* v. *Tintern Manor Water Co.* (N. J.), P. U. R. 1918A, 196.

"A reading of the cases discloses that, the terms going value, going concern value, and cost of establishing business, have not always been considered synonymous and in reading the cases it is well to have this in mind. One author claims that 'going value' means, as a matter of common consent among its originators, the present value of a prospective income. Marks on Practical Rate Making and Appraisement, p. 188.

"Going concern value or cost of establishing the business is 'that part of the development expense of the business of a public utility, which has exceeded a fair return upon the investment, and has not been recouped or more than recouped by profits in later years.'

"The terms, going value, going concern value, and cost of establishing business have grown to have the same meaning in rate making cases and will be so treated in this opinion. These terms are of recent origin and under them it is intended to give to a public utility plant such a value as will prevent an injustice being done the investors in fixing rates, and at the same time protect the public against having the rate base represent a fictitious value. This value should

not be measured by 'rule of thumb', neither is it a purely theoretical or speculative thing to be arbitrarily fixed as a percentage of reproduction new value of the physical property. Its ascertainment may to some extent call for an exercise of sound discretion, but the basis for it and the exercise of such discretion rests upon evidence of facts relative to the operation and financial history of this company beyond that of a few months just before appraisal, and until found independent of the physical property it bears no mere percentage relation thereto. It is true that it has no existence aside from the property used and useful in the business, and, therefore, it is difficult to treat it as a thing to be estimated by itself; but this difficulty does not come up for the first after consideration of the tangible property, but is present from the beginning of an appraisal of a going concern.

"In appraising the physical property in use by defendant company it would be impossible to give it junk or scrap value or mere material or less than vitalized value and have it amount to the sum found. Consciously or unconsciously the going value is to some extent reflected in an appraisal of the physical property, otherwise we would have to imagine a situation under which there would be nothing in service upon which to fix intangible service value. May going concern value of an established business be computed as a percentage of the value of the tangible property, or must it be based upon evidence of actual sacrifice of the investors for the good of the service and now reflected in or of benefit to the business in hand and of value to rate payers? It is true that rate fixing cases can be found, in which an addition for going concern value has been made to an estimate of reproduction cost new—less depreciation, but the fallacy in doing so is well pointed out as follows:

'In other words, having reduced the rate base below the investment and below the estimated reproduction cost on the historical or some other basis, the court or commission then filled the gap which had thus been created by replacing all or most of what had been taken out, the amount thus being replaced being called "going concern value." Such procedure is, in our opinion, entirely unsatisfactory. It seems to result from a subconscious realization that without such addition the rate base

would not be just and reasonable to the public utility, and that such base must be made right by restoring under some other name, what had been taken away.

" 'Where, however, the base used is the investment or the estimated cost to reproduce new, adjusted if necessary, it is generally unfair and unjust to the consumer to add thereto any so-called "going concern value" except at times in connection with an item which is sometimes called "going concern value" but which is really unpaid development expense.' *City and County of San Francisco* v. *Pacific Gas & Electric Co.*, P. U. R. 1918A, 506.

"In the case at bar, the cost of establishing the business was not based upon unrequited sacrifices of the investors, nor a consideration of the invested capital, return thereon, expenditures, operating cost, maintenance, financial history of the company, etc., but upon an assumption that, because the business is now in operation it would cost $835,215 under existing expense conditions to bring it to its present efficiency point of service.

"Counsel for the company stated in their brief before the commission:

" 'These allowances do not cover differences between revenues and expenses during the early years of business. They cover an estimated period of one year only.'

"The testimony shows that the estimate was made on the basis of operating expenses for the year and a half before the appraisal. This is mentioned, not to call attention to the mistake of counsel as to the time, but to emphasize the position taken by the company with reference to going concern value.

"Under the method adopted, it is not the cost of establishing the business in hand at a sacrifice to the investors that we have at all, but an estimate of what it would cost to make it a going business if it were not a going business. But it is a going business and to estimate an expense upon an hypothesis that does not exist is to reach a value upon theory alone.

"It is a truism that:

" 'In rate making cases the corporation whose rates are under consideration is always a going concern.' *Pioneer Telephone & Telegraph Co.* v. *State* (Okla.), 167 Pac. 995.

"Estimating what it would cost the company to establish the business in 1915, in the face of the fact that the business was established years ago and the company comes before the commission to ask for a raise in rates for services now of greater cost to it because of present conditions, is to shut one's eyes to existing circumstances and indulge in theoretical summarizing. The method adopted leaves out all consideration of the actual history of the company, its rates as formerly fixed by itself, its management whether efficient or otherwise, its operating expenses whether proper or not, its expenditures for equipment or extensions whether now in the tangible appraisal or not, its revenue and what has been done with it, and its return to the investors, and instead of finding what sacrifice, if any, the investors have made to produce the utility service before the commission, cost of establishing the business is based upon a fluctuating premise, which has nothing to do with the expense to the company in fact, and is well illustrated in the following question put to Mr. Hagenah and his answer:

"'*Q.* Of course, if we did this thing over again next year, and your wages had increased 40 per cent., it would give a still higher cost of organizing the business?

"'*A.* It would tend to increase the amount, yes.'    (R. pp. 1499-1500.)

"Mr. Hagenah made no effort to find the actual cost of establishing the business from the records.    He was asked:

"'Do you mean to tell this commission, Mr. Hagenah, that this company has not the items which make up the cost of establishing that business from 1904 down to the present time?'

"His answer was:

"'I don't know what has transpired since 1904.    I am dealing with the property as it is today.'    (R. p. 1501.)

"It seems then that the question of going concern value in this case turns upon whether we adopt the rule of cost in fact to the investors, or a rule under which a theoretical establishing of an established business is set up on a reproduction cost new basis, and take the year and a half immediately preceding the ap-

praisal with its estimated costs of doing so, as the criterion, regardless of revenue. This latter is not the rule to be adopted in rate fixing cases, for it gives intangible value regardless of the facts. If full justice has been done the investors in fixing the value of the tangible property used and useful in the service now being given, and this it appears has been most liberally done, then going concern value has been considered and not junk value, and there is no occasion to do more, except to ascertain the sacrifices made by the investors, if any, and now of benefit to the service of rate payers outside of the tangible property. The tangible property is used in the business, and as assembled has been appraised; its condition of life and percentage of efficiency in performing actual service has been given, and in no sense has it been estimated apart from its value to the going business.

"This subject is well covered in the late case of *Re Kewanee Home Telephone Co.* (Ill.), P. U. R. 1918B, 172.

" 'The theory of going value as a factor of consideration in rate investigations base on physical valuations is the subject of much criticism and general comment and argument at the present time. While it is generally recognized that going value as a factor of consideration in rate cases can only be interpreted to be unearned early losses, nevertheless many reputable engineers strongly favor the comparative method of computing going value, and contend that going value as a term means literally the difference in value between an operating and non-operating plant; meaning, of course, the increment of value that can be credited to the development of the business. * * *

" 'While a utility may be entitled to a return upon a valuation which takes into account that it is a live organization actually supplying customers, and so of more value to its owner than it would be if idle or just completed and ready to solicit business but not actually in full operation, it appears that to the full cost to produce new, less depreciation, no condition should be made for value inherent to the physical property, because the company is actually in successful operation. It would seem that, by crediting the company with the full cost to reproduce new, less depreciation value, based on the petitioner's report, the property is already appraised as that of a going concern. The facts are that whether the commission shall or shall not consider going value as an additional property item in the valuation for

rate making purposes, depends entirely upon the interpretation of the term "going value." If we mean by going value the exchange value of the entire property of the utility, then, obviously, going value should not be considered in a rate case. On the other hand, if we classify the early losses in revenue incurred by a utility as going value, then it is proper and just that a consideration of going value be made when the question of rates involves the question of property values.'

"In the case at bar, why spend time estimating what it would cost to animate the 'bones' of a purely hypothetical plant imagined to be ready to start business but without customers or perfected living organism, when we have the living plant actually doing business? If the object is to ascertain the value as a created thing, then comes the question of whether it has been paid for by the rate payers in the past, or, does it represent unrequited sacrifices made in behalf of the business by the investors? Under the theoretical method of computing going concern value the public is cut off from showing that the returns in the past have paid all the costs of establishing the business, and it is not fair to the rate payers to capitalize such a thing into the rate base by mere hypothesizing. Under the actual cost standard going concern value is based upon the sacrifices made by the owners in establishing the business to a paying and efficient state and not recouped out of later returns. If the early losses have been treated in the accounts as operating loss and not as invested capital, and, if subsequent years have wiped out the early losses, it may be difficult to justify the inclusion of any cost of developing the business among the intangible elements of value. And this possible result may not be avoided by a mere assumption of this increment of value. If part of the cost of establishing the business is present as a result of early sacrifices of right of return on investment and represented in added equipment, then it has been appraised as tangible property. When a telephone company seeks to have the cost of establishing its business capitalized into its rate base, it must establish such cost by evidence showing not only the nature of the same but the unrequited expense thereof and not leave it to be inferred. If the expense is made known, rules of law

and equity can be applied. Is it equitable to add $835,215 to the physical property of a plant as old in business as this one, as representing the cost of establishing the business, without evidence of nature and extent of such expense? It is not enough to show there has been operating expenses; the amount thereof must be shown, if possible, the nature thereof, so this court can say whether they were proper, fix the amount by safe standard, and know whether any part of the same has gone into the property now appraised as tangible and also be able to say that the same has never been requited. The business in hand must control upon this subject, the facts, as far as possible, must be shown, the costs must appear, if within reach, the full operating expenses, including extent and the nature and need, the cost, rates, revenue, capital, investment and return thereon must be shown as far as possible before we are permitted to theorize or base an estimate on conjecture reduced to arbitrary percentage. Conceding the difficulty of doing this, does not dispense with the need. The case at bar shows the need of going into the history of this company. In the first instance, the business now being conducted by the company was not established by it but another company, and the sale on foreclosure to this company did not transfer to this company, so as to have it go into the rate base, the cost to the former company of establishing its business. The same can be said of the purchase of competing companies by this company.

"The intangible value of $835,215 placed in the rate base by the commission is set aside.

"Four-Party Line Rate. The four-party line service is unreasonable and discriminatory, and was so intended by its proposer, the telephone company; the scheme of the company being to drive the four-party line subscribers to take the two-party line service rather than to put up with the annoyance of reporting their letter at each call, having limited service for the flat rate and a measured service beyond two calls a day. It is true that the commission did not adopt the proposal of the company to give but fifty calls a month for the flat rate; but this does not change the purpose the company had in mind. The four-party line service was originally installed by the company as a cheap ser-

vice to attract subscribers and has proved so popular as to overload the lines of the company, and, while the old service contracts put a limit on calls per day, the company has, in fact, given unlimited service, but now in an effort to rid itself of a condition it claims is embarrassing to its business, the company wants and expects this new rate and its measured service and regulation to accomplish the end of forcing subscribers to give up that kind of service and take the two-party line service, or in default thereof pay more for four-party line service than for two-party line if the telephone is used to an extent it should be used to justify having one at all.

"There are about 47,000 subscribers to the four-party line, and an estimate made by the company shows that they use on an average for the entire group 1,074 calls per year, but quite a large percentage of them use upward of 1,700 calls per year, and some of them go as high as 7,000 calls per year per telephone on the line. The rate fixed by the commission for the four-party line service crosses the two-party line rate at the point of eighty-six calls per month. The manager of the company estimated that a limit of fifty calls per month at a flat rate with measured service beyond that would drive about 10,000 four-party line subscribers to change to the two-party line in order to save paying more for four-party line limited and poor service than for two-party line unlimited and better service, and in this he is too conservative. This limited flat rate four-party line service will permit the housewife in the morning to reach the butcher and the baker but stops short of the 'candle-stick-maker,' until the palm of the company is met with four cents. The rate and its measured service for the four-party line telephone is unreasonable, and viewed from the standpoint of the two-party line rate and service, having in mind the telephone as something more than a parlor ornament, is in accord with a studied scheme on the part of the company to discriminate so unjustly against the use of the four-party line service as to compel subscribers to go to the two-party line service.

"Under the confessed purpose of the company this so-called rate is not a rate intended to meet a service,

209—Mich.—29.

but a club in the hands of the company. The discrimination here is not upon any difference inhering in the cost of the service rendered, but upon the mere circumstance that the company desires to make a rate for one method of its service unpopular and so burdensome when compared with another rate and method, that rather than submit to exactions and annoyances, and even then probably pay higher than for unlimited service, the patrons will be forced away from it. When measured with the two-party line rate, the rate for four-party line service is not a rate at all in the sense of being a fair compensation for a service rendered, but is a mere policy of the company as a means of accomplishing an end.

"A rate adjusted so as to accomplish what the solicitations of the company have failed to bring about, that is, to drive at least 10,000 of the present subscribers away from it because it will cost them more to stay under it and have a reasonable amount of service than to pay a higher rate, is not a just or reasonable rate at all, but a mere instrument in the hands of the company to force subscribers away from it and to a higher rate. If this rate remains then the plan of the company will be carried out, and if its expectations are realized, then it will force 10,000 subscribers to reject it on its merits and will bring the company $120,000 a year additional revenue, because subscribers will at once see that it is unreasonable to pay the four-party line rate. If subscribers will be forced to so decide as a matter of practical fact, then this court would be guilty of less than common perception not to recognize the injustice of the rate.

"The discrimination above mentioned may not fall within the strict lines of statutory definition or the holdings of the courts relative to preferential rates, because this situation may never have arisen before, but it does fall within the meaning of unjust and unreasonable rates. Having in mind the right of the four-party line subscribers to a reasonable rate for the service they get, is the rate as fixed appropriate to that end, or does this rate when compared with the two-party line rate, appear arbitrary or capricious and well calculated to accomplish something besides fixing compensation for a service to the user. If $36 a year

is a reasonable rate for a two-party line service with unlimited right of use, then $24 per year for an admittedly poorer service and limited to two calls a day with an exaction of four cents per call beyond that is unjust and unreasonable. But it may be said that the subscriber does not have to take the four-party line service. That is true, but 47,000 have it now and have a right to a reasonable rate and such a rate should be fixed. The rate as now fixed is but a feeder to the two-party line business of the company.

"The rate fixed for four-party line service is unreasonable and unjust and is set aside.

"American Telephone & Telegraph Company Contract. The bill alleges that the commission based their opinion and order in part upon an independent investigation relative to the question of the contract between defendant company and the American Telephone & Telegraph Company, without giving plaintiff notice of an opportunity to be present and take part therein.

"The answer of the commission admits:

" 'That for the purpose of becoming familiar with certain features of the hearing, an examination was made, by the commission, of the laboratory of the American Telephone & Telegraph Company, by and through which certain services were alleged to have been performed by the American Telephone & Telegraph Company for the Michigan State Telephone Company in part consideration of certain payments made by the Michigan State Telephone Company to the American Telephone & Telegraph Company; that likewise an examination was made of the plant and facilities of the Western Electric Company to enable the commission to more fully understand the testimony given upon the hearing with relation to said subjects; that the order issued by the Michigan railroad commission embodies the result of these considerations.'

"Plaintiff claims that it was error for the commission to make such *ex parte* investigations and the order of the commission should be set aside. It, therefore, is to be determined what legal effect, if any, is to be given an order of the commission made under such circumstances. The statute provides that the testimony submitted to the commission shall be available for use in this court upon this hearing, and this, of

course, cannot be done, if the commission makes a personal investigation not of record. While it is not inherently wrong for the commission to make a private investigation, and no claim is made here that in this instance it was made from other than worthy motive, yet, *in a jurisdiction where right of court review, upon the evidence submitted to the commission, is open to an aggrieved party, such an investigation, if permissible at all in cases where the parties in interest are actually submitting their evidence in the presence of each other, should be no more than a preliminary to the bringing of what is disclosed upon the record and to the knowledge of the parties and afford them an opportunity to test the correctness thereof or refute the same, and also make it available for court review.* Upon this hearing the findings of the commission are not in the nature of evidence and cannot supply what the statute provides shall come here from the commission.

"In a suit to set aside an order of the commission, when it is made to appear that an investigation was made by the commission of a material matter, without notice to parties putting their evidence in publicly before the commission, and without an opportunity being afforded such parties to know the nature of what has so come to the commission and without chance to test or refute the same, and such *ex parte* investigation is made by the commission to enable them to more fully understand a subject in dispute between parties trying out an issue of fact before them and the investigation is made of matters under the control of one financially interested in the determination to be made by the commission, and the commission embodies in their order the result of such private investigation, and leave the same wholly off the record available for review by this court, then, to say the least, the statutory presumption in favor of the action of the commission in such matter is removed and the plaintiff is relieved from showing by clear and satisfactory evidence that the order in this particular is unlawful and unreasonable.

"While the commission may examine into the matters before them without technical nicety of procedure, yet the right of a party in interest to a hearing must be

preserved. There is deprivation of this right when a party is prevented from knowing all the evidence submitted or considered by the commission upon a particular subject, and, therefore, has no opportunity to test the correctness thereof or explain or refute the same.

" 'Though a commission is not limited by the strict rules as to the admissibility of evidence, which prevails in suits between private parties, yet, the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended. In such cases commissioners cannot act upon their own information as could jurors in primitive days. All parties must be fully apprised of the evidence submitted or to be considered and must be given an opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal. Collier on Public Service Companies, § 192. Allowing the testimony to be heard by the commission, or one of its members, without opportunity to cross-examine the witnesses presenting it, amounts to practical denial of the vital parts of the hearing required by this statute.' *Farmers' Elevator Co.* v. *Railway Co.*, 266 Ill. 567.

"Under the circumstances the order of the commission upon this matter might be set aside as contrary to law, but the importance of the question or right involved leads me to pass on the merits upon the record before the court. It appears that the Michigan State Telephone Company in 1904 entered into contract under which it obligated itself to pay the American Telephone & Telegraph Company $4\frac{1}{2}$ per cent. of its total gross earnings as a consideration for the use or rental of telephone instruments furnished by the American Telephone & Telegraph Company, and it is also claimed the latter company gives financing, engineering, accounting and legal services under the contract. This contract, in fact, was an election on the part of the Michigan State Telephone Company to accept, assume and adopt the provisions of former contracts between the American Telephone & Telegraph Company and the Michigan Telephone Company, so far as the same remained in force and operative. The Michigan Telephone Company was formerly in business in this State, but was defunct before the organization of defendant company.

"Upon this subject the contract provided:

" 'Each of said contracts has, from time to time since the respective dates thereof, been modified and supplemented, and a number of provisions thereof have become nugatory by change of circumstances or of policy, or have been otherwise waived or cancelled, and the meaning and scope of many of said provisions have been fixed by a practical construction thereof by dealing between said Bell Company and the Michigan Telephone Company in common with a large number of corporations with which said Bell Company has similar contracts and relations, reference being hereby had and made to all such modifications, supplements, waivers, cancellations, practical constructions and dealings, with the same force and virtue as if the same or the substance and effect thereof were herein set forth at length and as if said contracts had been re-written so as to embody and conform to the same. * * *

" 'The Michigan Company does hereby elect to accept, assume and adopt each of said contracts and all supplements thereto, so far and to the extent that the provisions thereof, respectively, now remain in force and operative, and as said provisions have been modified and otherwise varied, and with the meaning and scope placed and fixed upon said provisions by the practical constructions and dealings hereinbefore recited and referred to.

" 'The Bell Company agrees that the Michigan Company shall have and does hereby grant to the Michigan Company the right and privilege to elect to accept modifications, supplements, provisions, waivers, cancellations, concessions, benefits and advantages of or arising from said license contracts so accepted, assumed and adopted by the Michigan Company, like those which may at any time be extended, tendered or granted by said Bell Company to the other companies with which said Bell Company has or may have contractual or other relations, in whole or in part, of a like or similar nature to those evidenced by the contracts herein referred to.'

"The original contracts were license contracts, but in 1902 were changed under an acceptance of the following offer:

" 'The American Bell Company hereby offers, until further notice, to substitute for the rental upon telephone instruments (magneto telephones and battery transmitters) payable by you under its license contracts held by you and circulars in modification thereof, four and one-half per cent. (4½%) of the total

gross earnings of your company. * * * Said percentage will cover all instruments in use by you under your authority in your territory, including instruments used on switchboards or for other operating purposes, and those for which no consideration is received by you, and also will cover those in stock, which last are not to exceed three per cent. (3%) of the total number charged to you.'

"At the time the contract was made in 1904 the American Telephone & Telegraph Company was not a stockholder in the defendant company, but has since then become owner of about 97% of its common stock and something over 50% of its preferred. Just what relations existed in 1904, if any, outside of contract, between the companies relative to power of control by the American Telephone & Telegraph Company does not appear.

"A raise in rates increases the sum to be paid on the contract. The city contends that the American Telephone & Telegraph Company should be paid a fair rental value for its equipment leased to defendant company or held in reserve for it, and no more, when it comes to the matter of rates to be paid by the public. During the year 1915, that being the year of appraisal, the defendant company paid to the American Telephone & Telegraph Company, from its gross revenue, the sum of $147,415.98. During that year there were approximately 95,000 telephone instruments in use in the Detroit exchange district. These instruments were bought by the American Telephone & Telegraph Company from the Western Electric Company, a manufacturing concern, the stock of which is owned by the American Telephone & Telegraph Company. The instruments cost the American Telephone & Telegraph Company $2.13 per set in 1915, including a 20 per cent. profit to the Western Electric Company.

"The city contends that, at the outside, considering the cost of the instruments, allowing 8% for depreciation, 8% return on such cost and taxes and repairs, a proper rental charge should not exceed 40 cents per annum for each instrument, and upon this basis the 95,000 instruments in use and the 3% in addition held in reserve under the agreement, making 97,850 set in all, at an annual rental value of 40 cents per set would

amount to $39,140, or $108,275.98 less than what was paid in 1915.

"But the company claims that the American Tele-phone & Telegraph Company not only furnishes the instruments, but through its general staff and other-wise, renders engineering, accounting, legal and financial services, and keeps abreast of all improvements in telephonic equipment and methods of operation, and such matters are to the great advantage of the defendant company and in money value exceed all sums paid under the contract. To this the city makes answer that the contract does not obligate the American Telephone & Telegraph Company to do any of these things and if they are done they are performed either as a gratuitous service for a subsidiary or as mere self-serving acts for its own pecuniary advantage and in behalf of its practical ownership of defendant company. The company claims that under the contract and by practical construction arising out of their dealings such matters have received the force of contract relations. Witnesses for the company have given testimony relative to the general nature of the services and their opinions upon the value thereof. Outside of the furnishing of telephone instruments, what does the contract obligate the American Telephone & Telegraph Company to do? It is true that former contracts with a defunct company, so far as the same remained unchanged, were adopted, but what part of such former contracts remained in force and did any of such contracts provide for such services? We have the contracts and upon their face they provide no such thing.

"Considering the written contract between defendant company and the American Telephone & Telegraph Company, as given in part above, it is apparent that, in order to trace down its scope it must first be determined to what extent the adopted contracts not only remained in force but in what manner and to what extent they had been modified and supplemented, become in part nugatory by change of circumstances or of policy, how much waived or canceled, just what meaning and scope had been fixed by a practical construction through dealings with the defunct company or a large number of other companies known only to

the American Telephone & Telegraph Company, because 'all such modifications, supplements, waivers, cancellations, practical constructions and dealings' were adopted 'as if said contracts had been rewritten so as to embody and conform' thereto.   To ascertain the meaning and scope of this contract, beyond its plain and expressed purpose of securing telephone instruments, is beyond the reach of any one questioning the same, because the knowledge rests with the American Telephone & Telegraph Company alone.   This contract may be considered satisfactory between two corporations, one now subsidiary to the other, and, therefore, with synchronized impulses, but to others it is so indefinite and uncertain without intrinsic evidence covering the dealings between the American Bell Telephone Company, the American Telephone & Telegraph Company, the defendant company, the defunct Michigan Telephone Company, and all the telephone companies in the United States with which the two first named companies have had dealings whether in accordance with contracts or in any other way after contracts, for over thirty years, as to what the American Telephone & Telegraph Company is obligated to give for the percentage of gross earnings so fixedly exacted, and is so drawn as to absolutely render impossible any effective investigation by the public, that it must not be put on the public to pay in their rates, beyond disclosed services falling within its clear provisions, and then only for value received.   This court does not hold that the contract is void; the contract may be valid between its makers and satisfactory to them because, financially speaking, they are practically now of one mind, but the enveloping possibilities rendered thereunder and by loose construction thereof of participating in dividing revenue must stop short of reaching regulatory exactions from the public for utility service, except to the extent above mentioned.

"The company contends that this contract, being satisfactory to the parties to it and practically construed by them for 14 years, and benefits received, payments made and services rendered, no third party can question that which those mutually bound do not question.   In this matter the public is not a third party to the rights of those asking that rates be fixed for the

public to pay for utility service, but the party asked to pay every dollar and it requires something more than practical construction and mutual satisfaction on the part of the party collecting from the public and the other participating in the collection, to tie the public to carry out such an arrangement. That the public is not a third party with reference to contracts made by the defendant company and, therefore, without voice as to whether the rates shall meet their requirements or not, ought to be apparent upon the most casual consideration of the subject, and defendant company and the American Telephone & Telegraph Company fully recognize this and have practical application of it in this very proceeding, in the relief granted by the commission in setting aside the low rate, long time contracts made by the company at a time it wanted to meet competition. The expense of the defendant company, arising out of the 4½ per cent. contract, and now put on the public in full to meet, brings the public squarely to the point where it may question not only the legality of the contract but as well be heard upon the subject of the amount that in equity and good conscience shall be taken under public authority for the benefit of the American Telephone & Telegraph Company under such contract. Money so exacted from the public for utility service must bear a true relation to benefits conferred by the receiver, and the public has an undoubted right to question the expenses the defendant company asks be taken care of in the rates the public must pay, and a right to see the contract.

"This contract has been before several commissions in rate fixing cases and has been approved in some cases and rejected in others. A reading of the holdings upon the subject of this contract, consideration of the contract and the evidence and the equities of the case leads to the conclusion that the public should be required to pay in rates only so much thereunder as is represented in a fair valuation of use of the instruments and that amount should be fixed at 40 cents per set per annum. If the dominant company wants to exact more than this from its subservient company, it is, of course, at liberty to do so, but its remedy must steer clear of collecting it from the rate payers.

"The holding of the commission that this 4½ per

cent. per annum is a fixed charge and may be collected from rate payers for the American Telephone & Telegraph Company under the contract with the defendant company is set aside and the sum to be collected of the rate payers should be fixed at 40 cents per year per set of instruments furnished by the American Telephone & Telegraph Company, including the 3 per cent. in reserve.

"Depreciation Reserve.    There is merit in the objection made by the city to the allowance of 5.6% upon the depreciable fixed capital.    This percentage should be materially reduced and a limit placed on the amount of the fund beyond which its accumulation shall not proceed.    My views on this subject are expressed by the supreme court of Oklahoma in an opinion filed in September, 1917.

" 'Another ground for complaint is based upon the claim that the corporation commission refused to allow the company a sufficient reserve for depreciation. The commission held that, inasmuch as the evidence showed that the physical plant was kept up to a high degree of efficiency by replacements paid for out of current revenue, and that any deterioration covered by obsolescence would not affect the result in case at bar, there was no depreciation, and, therefore, an allowance for a reserve fund to take care of depreciation was not necessary, and should not be allowed. The contention of the company on this point is that, notwithstanding every part of a properly constructed and well equipped telephone system may be maintained in good condition from year to year out of the maintenance fund, yet the time inevitably comes with every building and unit of equipment when it can no longer be kept serviceable by repairs or current maintenance, and when it must be replaced substantially in its entirety. * * *

" 'A great many authorities and opinions of experts are cited by counsel for the company, which they say conclusively show the economic necessity for the principle contended for, among which are the following:

[The court gives a list of many cases.]

" 'The expert opinion relied upon consists of an article by Mr. William B. Jackson,' entitled, Depreciation and Reserve Funds of Electrical Properties, published in the Electrical Review of March 7th, 1910, p. 934, the report of William J. Hagenah in his investigation of the Chicago Telephone Company, 1910, and in

the second volume of Telephony, p. 102. After examining such of these authorities as are available to us, and others on the same subject, not cited, we find ourselves unable to agree with counsel in their assumption that the doctrine of depreciation, as contended for by them, meets with universal approval of the courts and economists. From our investigation of the problem of depreciation we are convinced that precedent on this question is varying, and that there is also great contrariety of opinion among the heads of public service corporations themselves, some companies believing that their best interests lie in adopting the largest possible depreciation charge and in the consequent accumulation of a permanent fund in the future, whilst others contend that the application of the doctrine amounts to a virtual confiscation of their property. Without attempting to set out herein our analysis of these discordant views, it is sufficient to say that we have reached the conclusion that in plants of considerable size that have attained their gait, to which class the plant herein is conceded to belong, there is both theoretically and actually a normal condition in which the replacements come along with comparative evenness, and where there can be no possible use for so-called depreciation fund of any considerable amount.

"'In the case at bar, as we have seen, the commission made no deduction from the value of the plant on account of depreciation, but allowed returns upon its value as a going concern, kept up to a high degree of efficiency by replacements paid for out of current revenue. There is no principle of public regulation more firmly established than the right of the company to charge in its rate an amount which will enable it to make these replacements, and as investors put their money into public utilities for the sake of the returns they will be able to obtain, if the allowance for replacements is sufficient to keep up a high degree of efficiency and prevent a lowering of the ability of the plant to earn returns, we are unable to perceive the necessity for building up a fund to be used for the purpose of counteracting a purely theoretical depreciation.' *Pioneer Telephone & Telegraph Co.* v. *State* (Okla.), 167 Pac. 995.

"Rate of Return. The commission allowed 8% as the rate of return. The city claims this is too high. It has been said:

"'The rate of interest on money and ordinary rates of income on capital invested have fallen enormously in the last few years. Every one knows this, and the court that does not know it is certainly not fit to review the acts of a commission that should

know it.' *Steenerson* v. *Railway Co.,* 69 Minn. 353 (72 N. W. 713).

"An examination of the cases show that rates of return, as a rule, are allowed at from 5 to 8 per cent, depending upon circumstances in particular cases. Having in mind the actual investment in this plant, the value of the property as fixed by the commission upon reproduction cost new, less depreciation basis, the stability of the business involved, considering the field and monopoly therein under present public policy, the certainty of return under fair regulation, the rates for the use of money permitted under private agreement by law in this State, and giving due weight to court adjudications and holdings of commissions upon the subject, it appears that the rate fixed is too high. Money, as a rule, if safely invested, has a pretty well understood and expected rate of return, and if this rate is exceeded in the case of a corporation its stock goes to such a premium as will bring an investment in it to a reasonable rate of return. Eight per cent. return under the facts and circumstances disclosed in this case appears to me to be excessive and this court finds that 7 per cent. will be fair compensation and amply protect the rights of those whose moneys are invested in the company as well as the public interest.

"It follows from what has been said that the order of the commission cannot stand, and it is vacated and set aside in the particulars mentioned herein, and the matter will be remanded to the commission to take further action in accordance with the findings of this court."

The commission fixed the rate of return to which the telephone company was entitled at 8 per cent. The court set this aside and fixed the rate at 7 per cent. The court undoubtedly had the right to set aside the rate fixed by the commission because unreasonable, but I am of the opinion that it had no right to fix the rate, for the reason that that question is a legislative one.

With this modification the decree of the trial court should be affirmed.